## SOUTHERN COTTON-OIL CO. v. HEFLIN.

(Circuit Court of Appeals, Fifth Circuit. January 23, 1900.)

### No. 843.

SALE—BREACH OF CONTRACT—MEASURE OF DAMAGES.

Plaintiff, who was manufacturing out of cotton seed, by the same process, oil, meal, cake, hulls, and lint, all marketable products, sold to defendant, at a fixed price per ton, all the cake and meal to be produced by the mill during the year. After receiving part of it, defendant gave notice that he would not accept any more, but plaintiff continued to manufacture it, and tendered the balance, which defendant refused. *Held*, that the measure of damages was the difference between the market value and the contract price.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

This suit was instituted in the district court of Waller county, Tex., on April 31, 1895, from which it was removed to the United States circuit court for the Eastern district of Texas, sitting at Galveston, in August, 1895. The plaintiff in error was a corporation chartered in the state of New Jersey, and owning a cotton-seed oil mill situated at Houston, Tex., at which mill it made the products of cotton seed from year to year. This was a suit instituted against the defendant in error upon the following contract:

"Philadelphia, April 12, 1894.

"R. L. Heflin, Esq.—Dear Sir: We have this day sold you all the prime cotton-seed cake and meal made at our Houston (Texas) mill during the season commencing September 1, 1894, and ending March 31, 1895; we guarantying a minimum quantity of six thousand (6,000) tons, and you not being required to receive a maximum quantity of more than ten thousand (10,000) tons. Any excess of ten thousand tons to be at your option. All at the price of eighteen dollars ($18) per ton of two thousand pounds, free on board cars at our Houston (Texas) mill. Same to be packed in good, merchantable sacks, and marked or branded as ordered. Terms, sight draft bill of lading attached. Shipments as fast as made and ordered. It is distinctly understood that we are to have the privilege at all times during the season above stated of supplying our local demands for cattle feeding at Houston, Texas, and our jobbing trade for consumption at that and other Texas points. It is also a condition of this contract that, in case of accident to said mill by fire or act of God, such as may prevent our making the quantity guarantied by us during the season above stated, this contract shall be void as to any part unfilled in consequence of such accident. It is further. agreed and made part of this contract that we shall not be required to furnish more than three-quarters of the total quantity delivered in meal, unless at our option.

"Yours, truly,                    The Southern Cotton-Oil Company.
                                  "By Henry C. Butcher, Prest.
"I hereby accept the above.                    R. L. Heflin."

When Heflin signed and returned the contract, he wrote, on April 15, 1894, to the president of the Southern Cotton-Oil Company as follows:

"Yours of the 12th inst., inclosing contracts, received. Same are in order, except as to shipments. After the words, 'shipments as fast as made,' I have added, 'and ordered,' and I now here agree that the mill shall not be without shipping orders at any time longer than ten days maximum, and for any excess I will pay both interest and insurance to date I give such orders. This is only fair, for, without any such stipulation last year, this mill had shipping orders always ahead of its production, except twice, and then not a whole week was it without them. * * *"

The declaration alleges that the plaintiff, in pursuance of its contract, delivered 2,084 tons of meal in September, for which the defendant paid in full; that the plaintiff delivered 1,904 tons in October, for which the defendant paid $15 a ton, leaving $3 a ton unpaid; and that the plaintiff tendered the balance, 6,012 tons, in pursuance of the terms of the contract, which the defendant refused to accept and pay for. This suit was brought to recover $5,712, being $3 a ton due on the 1,904 tons, with interest from October 31, 1894; and for $39,-047.94, the difference between the market price, $11.50, at which the plaintiff was compelled to sell the 6,012 tons, and the contract price, $18, which the defendant refused to pay. These, together with some expenses for insurance and for storage and handling the meal, aggregating about $2,000, constituted the cause of action on the part of the plaintiff. The defendant defended on the ground that the 1,904 tons were not "prime cotton-seed cake or meal"; that $15 was the full value thereof; and that the defendant was not compelled to take the 6,012 tons, because the defendant, on October 31, 1894, being thereunto justified by the failure of the plaintiff to deliver meal according to the standard of the contract, gave notice to the plaintiff that he revoked and canceled the contract, and would not abide by its terms any longer. The case was tried before the court and a jury at the March term of the circuit court at Galves-

ton, and there was a verdict for the plaintiff, on March 7, 1899, for the sum of $5,712, being $3 a ton on 1,904 tons, with 6 per cent. interest from November 1, 1894. The following extract from the charge of the court recites the facts necessary to be stated, and also shows the material question of law in the case: "This case was brought by the plaintiff, the Southern Cotton-Oil Company, against R. L. Heflin, charging, substantially, that in April, 1894, plaintiff and defendant entered into a contract by which defendant purchased from plaintiff its output of meal for the season of 1894–1895, commencing September 1, 1894, and ending March 31, 1895, for not less than 6,000 tons of meal, and not more than 10,000 tons, and any overplus of 10,000 tons being at the option of the defendant at the contract price of $18 per ton free on board cars at Houston. The defendant has alleged a specific agreement between himself and the plaintiff in regard to the quality of this meal and putting in these meshes. That should have been determined by your special findings against the defendant. Under the undisputed evidence in this case there are two thousand and eighty-four tons of the meal that were contracted for that were received and paid for by the defendant. It is true that some complaint was made by the defendant that it was found, after the meal had gone abroad, there was some complaint in regard to it, and it was settled for thereafter. That is out of this case. There were one thousand nine hundred and four tons of meal received by the defendant, who refused to receive it under the contract, at the contract price, because he said it was not the kind of meal contracted for. Thereupon the plaintiff and the defendant agreed that the defendant should take the meal and pay $15 a ton, which he did, and the question between them of the $3 a ton should be thereafter determined; and, if it was determined that the meal was up to the quality called for in the contract, which was prime cotton-seed meal, the defendant would owe them $3 a ton, and, if not up to the standard contracted for, he would not owe them $3 a ton. That was substantially the understanding between the parties. Thereafter, my recollection is that on October 31st the defendant, Heflin, gave the plaintiff notice that he would not take any more of the meal; that it was not up to the standard, and could not be made up to the standard, with the appliances they had. That is my understanding of the effect of that letter. The plaintiff claims that it made all the meal up to ten thousand tons, and it sues for $3 a ton on one thousand nine hundred and four tons, and it sues for $6.50 a ton on six thousand and twelve tons, and sues for interest and insurance, basing it upon a contract or letter not embraced in the contract, but a letter written by Mr. Heflin, stating if the meal was not shipped out as fast as made on the 10-day clause about shipping orders, that he would pay the insurance and interest. Therefore the determining question in this case is the question of the measure of damages in the event the contract was breached. It is a very doubtful question, but my judgment of the matter is that the plaintiff in this action has mistaken his remedy on the measure of damages. The plaintiff sold this meal for $11.50 a ton, and charged the defendant with the difference between that and the contract price. A notice that he would not take any more of this meal would not comply with the contract. The defendant did not escape liability, provided the plaintiff, in its action, asserted the right measure of damages. But when it was notified by the defendant that he would not take any more of the meal, then, in that case, the subsequent making of the meal was a matter which the plaintiff was making for its own account,— had a right to sell it to whom it wanted. But at the expiration of March 31st it had a right to bring its action against the defendant for such profits as it would have made by the defendant complying with the contract and taking the meal at $18 a ton. But it does not assert any such measure of damages here. It claims the right to enforce the contract whether the defendant wants it enforced or not, and it claims the right to sell the article, charging the defendant with the difference in price realized on the sale of the six thousand and twelve tons and the contract price. I do not think that is the measure of damages. Therefore you will not regard the six thousand and twelve tons in this case, and all that is left for you to consider is the one thousand nine hundred and four tons." The plaintiff duly excepted to that part of the charge relating to the 6,012 tons and the measure of damages, and also excepted to the refusal to give special charges presenting the theory contended for by

the plaintiff, which is fully stated in the opinion. The jury rendered a verdict for the plaintiff for $5,712, with interest from November 1, 1894, and judgment was entered for that sum. The plaintiff brings the case to this court on writ of error. The material error assigned is that the circuit court erred in the charge as to the measure of damages.

J. C. Hutcheson (Hutcheson, Campbell & Meyer and Jas. B. & Chas. J. Stubbs, on the brief), for plaintiff in error.

F. Charles Hume, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge, after stating the case as above, delivered the opinion of the court.

This is a suit for damages for breach of a contract. The material question in the case relates to the measure of damages. By the contract dated April 12, 1894, the Southern Cotton-Oil Company, the plaintiff in error, sold to R. L. Heflin, the defendant in error, all the prime cotton-seed cake and meal made at the mill of the former at Houston, Tex., during the season beginning on September 1, 1894, and ending on March 31, 1895, at $18 a ton of 2,000 pounds, free on board cars at Houston. The plaintiff guarantied a minimum quantity of 6,000 tons, and Heflin was not required to receive more than 10,000 tons. The cake and meal were to be packed in good, merchantable sacks, and marked or branded as ordered. The defendant agreed that the plaintiff should not be without shipping orders at any time longer than 10 days, and that for any excess (over 10 days) he should pay both interest and insurance to the date of the orders. 2,084 tons of meal were delivered by the plaintiff to the defendant under the contract, and were duly paid for. 1,904 tons were afterwards delivered in like manner, but Heflin claimed that the meal was not prime, and paid only $15 a ton for it. 6,012 tons were afterwards made, and tendered by the plaintiff to the defendant under the contract, which the latter refused to take, and the meal was then sold by the former at public sale, after notice to the latter, and it brought the then market price of $11.50 a ton. The plaintiff was engaged in the business, and had been for several years, of producing oil, meal, hulls, and lint from cotton seed. The 6,012 tons of meal were made after notice by the defendant to the plaintiff that the meal would not be received.

The first count in the declaration is for the difference between $15 a ton and $18 a ton on the 1,904 tons delivered under the contract, but not fully paid for. The plaintiff, under the ruling of the circuit court, had verdict and judgment for the difference, $5,712, with interest, and the questions relating to that breach of the contract are eliminated. There is also a count for damages for the failure and refusal of the defendant to accept the 6,012 tons, the price of which, by the contract, being $18 a ton. The plaintiff sold it, after notice to the defendant, at auction, for $11.50 a ton, which is shown to have been the market price. The plaintiff claimed and sued for $39,047.94, the difference between the contract price and the market price. The plaintiff recovered nothing on this count in

its declaration. The learned judge who presided in the circuit court was of opinion, and so instructed the jury, that the difference between the contract price and the market price of the 6,012 tons was not the proper measure of damages. The correct measure of damages, the learned judge held, was the profit which the plaintiff would have made if the defendant had received the meal at the contract price. The jury was, therefore, instructed to disregard the claim for $39,047.94. The court also held, in effect, that the defendant's notice to the plaintiff that he would not accept the meal ended the contract. The idea is that the damages must be fixed by the condition of things at the date of the notice, because the notice itself was a breach of the contract. It is true that the plaintiff could have acted on the notice, and treated it as terminating the contract; but it was not compelled to do so. It had the right to hold to the contract as still in force, and tender the meal according to the contract. If the plaintiff had been building a house for the defendant, or cleaning and repairing paintings for him, or, to use a comprehensive phrase, if his contract had been one to do work and labor, an unequivocal notice to quit work would have fixed the period of the breach and the time from which to assess damages. But the contract was an executory contract of sale, and the purchaser cannot, by his action alone, deprive the vendor of any of the benefits of such contract. In such case the refusal of the purchaser to take the goods must be unequivocal, and "must have been acted on by the plaintiff"; otherwise, the refusal in advance of the time for delivery does not fix the period for assessing the damages. In Smoot's Case, 15 Wall. 36, 48, 21 L. Ed. 107, the court, quoting Benjamin on Sales, said:

"A mere assertion that the party will be unable or will refuse to perform his contract is not sufficient. It must be a distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made; for, if he afterwards continue to urge or demand a compliance with the contract, it is plain that he does not understand it to be at an end."

The supreme court, in the case cited, in commenting on the English decisions, clearly affirmed the rule that, in the case of an executory contract of sale, where the defendant had agreed to receive and pay for wheat, and who gave notice that he would not receive it, the measure of damages would not be governed by the price of wheat at the time of the notice, but by its value at the time of the tender. In the case of Dingley v. Oler, 117 U. S. 490, 503, 6 Sup. Ct. 854, 29 L. Ed. 988, the court says:

"The words or conduct relied on as a breach of the contract by anticipation must amount to a total refusal to perform it; and that does not, by itself, amount to a breach of the contract unless so acted upon and adopted by the other party."

When the defendant gave notice that he would not receive the meal, he could not have complained if the plaintiff had acted upon the notice, and sued him at once. But he could not require the plaintiff to recede from its contract. The plaintiff had a vested right in the contract to deliver the meal sold at the time fixed by the agree-

ment, and no notice of the defendant could deprive it of this right. This seems well settled by authority. Kadish v. Young, 108 Ill. 175, 178; Railway Co. v. Richards, 152 Ill. 69, 100, 38 N. E. 773, 30 L. R. A. 33; Marks v. Van Eeghen, 30 C. C. A. 208, 85 Fed. 855; Sedg. Dam. (6th Ed.) § 284; Zuck v. McClure, 98 Pa. St. 541; Cooper v. Young, 22 Ga. 269.

The contention of the plaintiff is that the proper measure of dam-. ages is the difference between the market value of the cotton-seed meal and the contract price. If this contention is right, the instructions given to the jury were erroneous. The learned counsel for the defendant correctly says:

. "It is not the concern of the defendant to define and maintain, as applicable to the case presented, the true measure of damages. It is enough for him to .meet the claim of the plaintiff that the measure contended for by it is the true one."

It is not denied, however, by counsel for defendant, that on proper suit the plaintiff was entitled to damages in some measure for the breach in question. The learned judge who tried the case in the circuit court so held. He directed a verdict against the plaintiff as to the breach in question, because it had mistaken the measure of damages. He charged the jury: "It is a very doubtful question, but my judgment of the matter is that the plaintiff in this action has mistaken his remedy on the measure of damages." Notwithstanding his disclaimer of the burden of stating the true rule of .damages in the case, it appears from the argument of counsel for ·the defendant that the rule he thinks should govern is that the dam-.ages should be measured by the difference between the amount it would cost the plaintiff to make and deliver the meal and the con- .tract price; that is, that the plaintiff should prove and recover the ·profit it would have made if there had been no breach of the contract. We will state the two contentions side by side, so as to present both theories. The defendant contends that his notice that he would not accept the meal ended the contract; that, admitting his liability for damages, the following is the rule for assessing them:

"The measure of damages upon articles covered by such a contract, for which no materials had been bought, and upon which no work had been expended, at the time of the breach, is the difference between the amount it would cost the manufacturer to make and deliver them and their contract price, if that price is greater than the cost."

The plaintiff contends that the defendant's notice that he would not accept the meal did not end the contract; that the plaintiff could, at its option, notwithstanding the notice, still keep the contract in force, make and tender the meal according to the contract; and, having done so, that the measure of damages is the difference between the contract price and the market price, the former price being the higher. What the law aims at in all cases is to do justice between the litigants, and a just measure of damages is one which affords compensation, and only compensation. In the case of a breach of contract for work and labor done and materials furnished the rule is plain. The measure of damages in such case, where the employer stops the work, and the workman or contractor

sues, is (1) his outlay and expenses, less the value of materials on hand; (2) the profits he might have realized by performance. The first item he may recover in all cases. The second he may recover when the profits are the direct fruit of the contract, and not too remote or speculative. U. S. v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168. If one who has contracted to build a creamery is notified not to build it, he cannot go on and build it, regardless of the notice, and recover the contract price. Davis v. Bronson (N. D.) 50 N. W. 836, 16 L. R. A. 655. In Clark v. Marsiglia, 1 Denio, 317, the plaintiff, an artist, was employed to clean and repair certain pictures, the property of the defendant. The defendant, before the work was completed, notified the plaintiff not to perform the work. It was held that the plaintiff could not recover the whole amount agreed on for the work, but only compensation for such injury as he had received by the breach of the contract. From these cases it is seen that the measure of damages contended for by the defendant is, in the main, correct, when applied to a suit for damages for a breach of a contract to build a house, or when applied to a contract for work and labor. What is the rule for the breach of a contract of sale? In 2 Benj. Sales (3d Ed.) p. 1075, §§ 1011, 1012, it is said:

"Where a contract to deliver goods at a certain price is broken, the proper measure of damages, in general, is the difference between the contract price and the market price of such goods at the time when the contract is broken, because the purchaser, having his money in his hands, may go into the market and buy. So, if a contract to accept and pay for goods is broken, the same rule may be properly applied, for the seller may take his goods into the market, and obtain the current price for them. The date at which the contract is considered to have been broken is that at which the goods were to have been delivered, not that at which the buyer may give notice that he intends to break the contract, and to refuse accepting the goods."

In McLean v. Richardson, 127 Mass. 339, the plaintiff had sold hides to the defendant, which he refused to receive. On suit for damages for breach of the contract it was held that the measure of damages was the difference between the contract price and the price received on the resale of the hides. In Dustan v. McAndrew, 44 N. Y. 72, on similar facts, it was held that, on the purchaser's refusal to take the property, the vendor could sell it, after notice to the purchaser, and recover the difference between the contract price and that realized on the sale. That the measure of damages for the refusal of a vendee to take the goods is the difference between the market price and the contract price seems well settled by authority. Waples v. Overaker, 77 Tex. 7, 13 S. W. 527; Sedg. Meas. Dam. (8th Ed.) § 753; Id. (6th Ed.) p. 340, § 284; Suth. Dam. (2d Ed.) 647; Wood, Mayne, Dam. § 150; Chit. Cont. (11th Am. Ed.) p. 1079. The authorities indicate that one rule as to damages would apply if the contract in this case be one for work and labor, and that another would apply if it be an executory contract of sale. Is the contract in question here one of sale, or is it one for work and labor? It is true that work was to be done to convert the cotton seed into meal, but this was to be done by the manufacturer on his own material to prepare it for market. If the cotton-seed meal had been re-

ceived, and suit had been brought to obtain payment, would the action have been for work and labor done or for goods sold? Clearly, no recovery could be had for work and labor, because the work was done on plaintiff's material, and for itself. If the contract is such that a chattel is ultimately to be delivered by the plaintiff to the defendant, when it has been delivered the action would be for the sale of the chattel, and not for work and labor done. Lee v. Griffin, 30 Law J. Q. B. 252; 1 Benj. Sales (3d Ed.) § 116. "From the very definition of a sale, the rule would seem to be at once deducible that, if the contract is intended to result in transferring for a price from B. to A. a chattel in which A. had no previous property, it is a contract for the sale of a chattel." 1 Benj. Sales (3d Ed.) § 117.

The case of Masterton v. Mayor, etc., 7 Hill, 61, has been quoted approvingly more than once by the supreme court of the United States. We find the case cited in both briefs in the present case. That case sheds much light on the question contested here. The plaintiffs contracted to procure, manufacture, and deliver all the marble necessary for a certain public building, in consideration whereof the defendants agreed to pay the plaintiffs a specified sum in installments as the work progressed. Some of the marble was delivered and paid for. The defendants then stopped building, and notified the plaintiffs that they would not take any more of the marble. It will be seen at once that the case, in some of its features, is strikingly like the case at bar. The court held, in a suit for damages for breach of the contract, that the measure of damages "was the difference between what the performance would have cost the plaintiffs and the price which the defendants had agreed to pay." That is the rule which counsel for the defendant contends for. Without referring to other differences in the two cases, there is one thought running through the opinion quoted that shows that on the facts of the present case the New York court would have applied a different rule. The opinion shows that the rule as to damages adopted in that case was forced on the court by the fact that the marble had no well-ascertained market value. We first quote from the opinion the comments of the court on the English cases stating the general rule, and then the reasons given for departing from it:

"In Boorman v. Nash, 9 Barn. & C. 145, it appeared that the defendant contracted in November for a quantity of oil, one-half to be delivered to him in February following, and the rest in March; but he refused to receive any part of it. And the court held that the plaintiff was entitled to the difference between the contract price, and that which might have been obtained in market on the days when the contract ought to have been completed. See MacLean v. Dunn, 4 Bing. 722. The case of Leigh v. Paterson, 8 Taunt. 540, was one in which the vendor was sued for not delivering goods on the 31st of December, according to his contract. It appeared that in the month of October preceding he had apprised the vendee that the goods would not be delivered, at which time the market value was considerably less than on the 31st of December. The court held that the vendee had a right to regard the contract as subsisting until the 31st of December, if he chose, and recover the difference between the contract price and the market value on that day. See, also, Gainsford v. Carroll, 2 Barn. & C. 624. * * * The only difficulty or embarrassment in applying the general rule grows out of the fact that the article in question does not appear to have any well-ascertained market value. But this cannot

change the principle which must govern, but only the mode of ascertaining the actual value of the article, or rather the cost to the party producing it. Where the article has no market value, an investigation into the constituent elements of the cost to the party who has contracted to furnish it becomes necessary; and that, compared with the contract price, will afford the measure of damages."

If the cotton-seed meal had no market value, we might be forced to adopt a similar rule to prevent a failure of justice. Such rule, however, if feasible at all, would be very difficult of application here. The market value of a staple product is not likely to be below the cost of its production. It is usually above. The excess of market value over cost of production is the margin of profit. If the cost of production was less than the market price, $11.50 a ton, the rule contended for by the defendant would increase, and not diminish, his liability. Is not the contention, while it is fairly legitimate, really for the purpose of applying a rule that will make it difficult, if not impossible, for the plaintiff to make the required proof? The plaintiff was producing by the same process, out of the same raw material, several marketable products,—oil, meal, cake, hulls, and lint. The oil is the chief and most valuable product, but each product has a market value. The defendant insists that, to recover for the breach of the contract, the plaintiff must show the profit it would make on the meal at the contract price, and therefore show what it costs to make the meal. The proof would be difficult, and we know of no settled rule by which the costs of the material and labor could be apportioned among the various products. We do not say that damages could not be sufficiently proved to allow a recovery on such a basis, but we do hold that the application of such a rule in the present case involves such difficulty and uncertainty that it should not be applied when a just rule of easier application exists. In Griffin v. Colver, 16 N. Y. 489, 495, the court said that:

"Cases not infrequently occur * * * where the amount of damages may be estimated in a variety of ways. In all such cases the law * * * uniformly adopts that mode of estimating the damages which is most definite and certain." 8 Am. & Eng. Enc. Law (2d Ed.) 611.

In applying rules as to the measure of damages the courts must have regard to the particular facts of the case in question. Each case is sui generis. The court should not attempt to formulate rules in one case to govern all possible cases. It could not be done successfully, any more than a definition of fraud could be formulated to cover all future cases. We have commented on the different rules generally applied to cases of contract of sale and of contract for work and labor. But, without disputing about names, let us examine the characteristic features of this case. The plaintiff was not making one product only; it was making several, obtained from the same perishable raw material. All were made for sale. The meal sold to the defendant was not the chief product. When notified by the defendant that he would not take the meal, the plaintiff could not quit making it without stopping the mill and abandoning its business of making the other products. To do this the plaintiff would violate its other contracts as to oil, hulls, and lint. The case is not

analogous to a contract to make a soda-water apparatus, as in Tufts v. Lawrence, 77 Tex. 526, 4 S. W. 165, where only one chattel and two contracting parties are concerned; nor is it strictly analogous to a contract to manufacture cornshellers, as in Kingman & Co. v. Western Mfg. Co., 34 C. C. A. 489, 92 Fed. 486, where only one thing is being produced out of the same raw material. Cornshellers, or agricultural implements, cannot be said to have a well-established market value, like cotton, wheat, or cotton-seed meal. The courts may say in some cases that the work should be stopped on notice by one party of an abandonment of the contract, but in a case like the present one it would be impossible to fairly apply such a rule. The plaintiff must go on with its work, its regular business. One incident of its work is to produce the meal. On the defendant's refusal to receive it according to his contract, it having fallen in price, he is justly liable for damages, and the fairest and most certain measure of damages is the difference between the market value and the contract price. The circuit court erred in the instructions given the jury as to the measure of damages. The judgment of the circuit court is reversed, with instructions to grant a new trial, and to proceed in conformity to the opinion of this court.