In re BELLEVUE PIPE & FOUNDRY CO.

(District Court, N. D. Ohio, W. D.  December 3, 1910.)

No. 1,437.

1. SALES (§ 150*)—CONTRACTS—PERFORMANCE.
   A seller unable, because of limited means of transportation, to completely fill his obligations, must prorate his shipments to his customers and must show by competent testimony that a buyer complaining received his fair quota.
   [Ed. Note.—For other cases, see Sales, Dec. Dig. § 150.*]

2. SALES (§ 181*)—CONTRACTS—PERFORMANCE.
   Evidence *held* not to show that a seller, unable, because of limited means of transportation, to completely fill his obligations, prorated his shipments to his customers, and to show that a buyer did not receive his fair quota.
   [Ed. Note.—For other cases, see Sales, Dec. Dig. § 181.*]

3. SALES (§ 89*)—CONTRACTS—MODIFICATION—EVIDENCE.
   Evidence *held* not to show that a contract for the sale and delivery of iron for a specified period was extended.
   [Ed. Note.—For other cases, see Sales, Dec. Dig. § 89.*]

4. CORPORATIONS (§ 397*)—ACTS OF OFFICERS—CONCLUSIVENESS.
   The mere fact that the same person was the president of two corporations, one of which became bankrupt, is not sufficient to make the bankrupt a party to a transaction between the solvent corporation and a third person, and, though the president could bind the bankrupt to furnish materials to the third person on the charge of the solvent corporation, the third person, who has not changed his position, may not complain of the refusal of the board of directors of the bankrupt corporation to fill the order.
   [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 397.*]

5. BANKRUPTCY (§ 154*)—CLAIMS—OFFSET.
   A claimant ordered materials from a corporation, but another corporation which became bankrupt, intending to charge the same to the

claimant, furnished the materials. The claimant, before changing his position or suffering any loss, learned of the facts and insisted on receiving the materials from the bankrupt. *Held*, that claimant made itself a debtor of the bankrupt without any right to offset against the shipment any claim it had against the other corporation.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 154.*]

6. SALES (§ 384*)—BREACH OF CONTRACT—MEASURE OF DAMAGES.

The measure of damages for breach of contract of a product of manufacture with a well-understood value in the market, fluctuating as the market fluctuates, is the difference between the contract price and the market value at the time of the breach; but, where the article has no standard market value, the measure of damages is the difference between the cost to the seller of its manufacture and delivery and the contract price.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1098–1107; Dec. Dig. § 384.*]

In the matter of the bankruptcy of the Bellevue Pipe & Foundry Company, a bankrupt. On petition for review of the decision of the referee on the trustee's petition to expunge claims of the Sloss-Sheffield Steel & Iron Company and the National Supply Company. Petition denied.

Smith & Beckwith, for Sloss-Sheffield Steel & Iron Co.

Taber, Longbrake & O'Leary, for National Supply Co.

Jesse Vickery, for trustee.

KILLITS, District Judge. The affairs of this bankrupt are before the court for investigation upon petitions for review of the decision of the referee on the trustee's petition to expunge the claim of the Sloss-Sheffield Steel & Iron Company, and also of the action of the referee with reference to the claim of the National Supply Company, and upon exceptions to the report of the special master commissioner on the unliquidated claims of the Warner Iron Company, of the receiver of the Sheffield Coal & Iron Company, and Woodstock Iron Works, Incorporated.

It will be unnecessary to discuss the facts of the case with reference to either one of these questions, for the court is impelled to sustain the referee touching the claims of the Sloss-Sheffield Steel & Iron Company and the National Supply Company, dismissing the petition to review the action of the referee in behalf of each of these claims, and also to follow the advice of the special master commissioner and to dismiss the exceptions to his report. As to each of these matters, the referee, who was also special master commissioner in the matter of the claims of the Warner Iron Company and the receiver of the Sheffield Coal & Iron Company and the Woodstock Iron Works, Incorporated, has in writing in detail set forth the facts and conclusions of law, and, in the main, the court adopts the reasoning of the referee and special master as its own.

In addition to the referee's finding in the matter of the Sloss-Sheffield Steel & Iron Company, we might add that it does not seem to us that the claimant has made a case bringing it within the provision of its contract with the bankrupt to the effect that it should not be held

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to a compliance with the terms of delivery if it were embarrassed by difficulties in transportation.

[1] It is established that, under a contract such as the one made by the iron company with the bankrupt, when means of transportation are limited so that the seller is not able to completely fill its obligations. to be exculpated it must show that it prorated its shipments and that the buyer complaining received his fair quota.

In this case, it was upon the iron company to show, by competent testimony, that the bankrupt in this particular received the same treatment ratably as any other customer. As the facts in this behalf are known particularly to the seller, it would seem that his mere assertions that he obeyed the obligation to prorate, unsubstantiated by data concerning the manner in which he met the requirements, are hardly sufficient.

[2] In this particular case, the iron company, in making its contract with the bankrupt, knew that its plant was partly out of commission; it took its chances that its furnaces would be in condition to make iron during the life of the contract; and knew also that the bankrupt would need iron from the beginning of the year 1907. The facts show that the iron company had, in the middle of January, 6,410 tons of iron in its yards of the qualities mentioned and embraced in the two contracts with the Bellevue Pipe & Foundry Company. It claims that during this month and the succeeding months was the period of greatest embarrassment to it on account of lack of cars for shipment; but it appears that its stock of iron of this quality in the two months between the 14th of January and the 14th of March had been lowered by shipment to the extent of nearly 3,000 tons, in addition to the increment of the furnaces manufacturing during this period to about half their capacity. In other words, that, notwithstanding the furnaces making the iron required to fill the Bellevue contracts were running to the extent of considerably more than 100 tons per day, yet the stock of iron in the yards, in the two months, decreased from 6,410 tons to 2,561 tons. We think it is a fair inference that, during the first three months of 1907, the iron company shipped out in the neighborhood of 15,000 tons of iron of the quality demanded by the Bellevue Company, and in this time not a pound was sent to Bellevue.

Whether we are to interpret the contract as intending that the thousand tons of iron contracted for by the Bellevue Company were to be shipped in equal installments during the six months prior to the 1st of July, 1907, or not, the fact remains that, applying to the interpretation of the contract the circumstances under which it was made and the purposes for which the iron was demanded by the Bellevue Company, known to the iron company, it must be that it was within the fair contemplation of the parties that some considerable quantity of iron, at least, was to be sent during the first three months of 1907.

This situation raises a very strong presumption that during the first half of the life of these two contracts the Bellevue Company did not have the benefit of the rule of ratable distribution during the period when transportation was most difficult to obtain, according to the

claimants, and the disproportion between the quotas received by bankrupt in the next three months and the capacity of the works is so great as to call for something more than mere assertions that bankrupt was fairly treated.

[3] Upon the other question decided adversely to the claimant by the referee, and in addition to the reason given by him, we have to suggest that the impression, gained from the fact that it was in the amended petition where claimant first set up the ground, that the claim that its contracts had been extended after the 1st of July, 1907, was an afterthought, is strengthened by a consideration of the record. Voluminous correspondence is brought into this record by way of exhibits, and from it it is noteworthy that not only was no claim made by the iron company of an extension of life of the contracts beyond the middle of the year when complaint was made to it that there was a default in shipments, but several times after the visit of Mr. Keller, upon which the claimant relies for an extension of the contract, claimant insisted on interest upon past-due shipments in a manner inconsistent with the thought that on the Keller visit it had been agreed that bygones should remain bygones.

On the 21st of May the bankrupt wrote an insistent letter, demanding faster shipment, and calling the attention of the iron company to the fact that the iron was all due during the first half of 1907, indicating that the bankrupt had no feeling that the contracts were extended beyond that period, and the failure of the iron company to respond in that behalf is strange if it in fact thought that the contracts were given extended life.

But the most striking feature of this correspondence in this particular is the way in which the claimant treated the letter of Mr. Stahl, of the 30th of July, in which he charges the claimant with holding the Bellevue people up, involving them in a large loss, and notifying them that, if the balance of the iron due on the contracts "is not in transit within two weeks, we will hold the amount that is due and bring suit for the amount of damage that we have been put to, adopting whatever means we may find necessary. Apparently you are under the impression the contracts were made for your benefit only. We think that a little experience in the courts of Ohio will teach you that both parties have rights under contracts in this state."

It would seem to the court that the receipt of this letter would be a loud call upon the iron company to bring forth its belief, if it had any, that the contracts had been extended through their negotiations with Mr. Keller in April. On the contrary, the only response to this letter of Mr. Stahl, in behalf of the Bellevue Pipe & Foundry Company, was a letter from Robert Field, sales agent of the claimant, dated August 10, 1907, reading in part as follows:

"I have been working most industriously with Sloss on the question of your Bellevue shipments, and Mr. McQueen makes me the following reply:

" 'Field, you may say to your Bellevue friends that we now have all of our furnaces in North Alabama working fine. We are making more iron and better iron in that section than ever before. There is now absolutely no reason why we should not catch up with our contracts, and I am confident that before the end of August we will have gotten out all the overdue tonnage,

where our customers are ready to receive it. Let Mr. Keller and Mr. Stahl understand this situation, have them join with us in working it out, and they will have no further trouble with us. Remit for the overdue tonnage and pay when accounts are due in future, and your friends will be taken care of at this end.' "

It is inconceivable, if Mr. McQueen and Mr. Keller had made the arrangement which Mr. McQueen testifies to and which Mr. Keller denies, extending the contracts beyond the 1st of July, that Mr. McQueen would write a letter upon the subject in the language quoted above, for then there would be no such a thing as overdue tonnage chargeable to the claimant.

There seems to be no question about the damages sustained in this particular by the Bellevue Company, and we think that the referee was right in his conclusion that the claim of the Sloss-Sheffield Steel & Iron Company should be expunged.

[4] In the matter of expunging the claim of the National Supply Company, as indicated above, we believe the referee was right, and his judgment is approved.

It appears that there was no privity on the part of the Bellevue Pipe & Foundry Company in the dealings between the National Supply Company and the Northwestern Company, the Detroit concern. The mere fact that Keller was president of both companies, at Bellevue and Detroit, would not be sufficient to make the Bellevue Company a party, and while Keller might perhaps, until repudiated, bind the Bellevue Company to furnish pipe on the charge of the Detroit concern but to the National Company, yet, until the National Supply Company was put in a worse position by its reliance upon Keller's action, it would have no right to complain if Keller's superiors in the management of the Bellevue Company—the board of directors— should refuse to fill the order.

[5] In this case, it is very plain that the Bellevue Company did not extend credit to the Detroit concern for the two car loads of pipe sent to the National Supply Company, but that the bankrupt intended to charge the same to the claimant. Of course, this same pipe was ordered, not of the Bellevue Company, but of the Detroit Company; but, before the National Supply Company changed its position in any degree or suffered any loss of any sort, it learned that the Bellevue Company was not supplying the pipe on its order to the Detroit Company, and when, with this knowledge, it insisted on receiving the pipe, it made itself a debtor of the Bellevue Company without any right to offset against the shipment any claim it had against the Detroit Company.

The exceptions to the report of the special master upon the unliquidated claims of the Warner Iron Company and the receiver of the Sheffield Coal & Iron Company and the Woodstock Iron Works, Incorporated, are dismissed, upon the reasoning and grounds set out in the special master's report.

It seems to us that the master did the only allowable thing when he fixed upon the day of the termination of the several contracts as originally provided for as the day for the default of the bankrupt in each case, and that he did as much as he could for each of these claim-

ants in excusing them under the circumstances from tendering to the bankrupt before that time all the iron called for by the contracts, respectively.

[6] The only question that caused much inquiry was that raised by the trustee—whether the proper rule of damages had been applied by the master. It seems to us that this rule is supported by the authorities given by the master in his opinion, and, in addition, by the case of Southern Cotton Oil Co. v. Heflin, 99 Fed. 339, 39 C. C. A. 546.

In cases where the subject of the contract is a product of manufacture which has a well-understood value in the market, fluctuating as the market fluctuates, such as a staple like pig iron, the only possible measure of damages is the difference between the contract price and the market value at the time of the breach. In cases involving as the subject of contract an article having no standard market value as a staple, such as that in the case of Kingman v. Western Mfg. Co., 92 Fed. 486, 34 C. C. A. 489, the rule is properly the difference between the cost to the seller of their manufacture and delivery and the contract price; but, in a case where a company is manufacturing a staple product, such as cotton seed cake and meal, as in the Heflin Case, or pig iron, as in this case, it would be absurd to hold the seller to a measure of damages involving mere profits.