SMOOT'S CASE.

1. The court calls attention to the efforts frequently made by contractors and by their counsel to construe contracts made with the government by appeals to its power, its magnanimity, and generosity.
2. Such appeals, it declares, can properly be presented to Congress alone; for the jurisdiction of the Court of Claims is of contracts express or implied.
3. In the construction and enforcement of these contracts, the Court of Claims is bound to apply the ordinary principles which govern such contracts between individuals.

[*] Digest of the Opinions of the Judge Advocate General of the Army; published by the War Department, Bureau of Military Justice; p. 146, paragraph 7, title "Discharge."

4. A. contracted with the bureau of cavalry during the late rebellion, to furnish to it, within a time specified, a large number of cavalry horses, sound, and of specified size, age, &c.  A. had no horses at this time; but meant to get them from other persons, their owners, who would send them through him for inspection, &c., so that he might fulfil his contract.  At the time of the contract, horses furnished under contracts to the department were, by its rules, to be examined and inspected without unnecessary delay, and if the animals were not satisfactory to the inspecting officer the owner took them away in the same state that he brought them.  Before the time that the horses in this case were deliverable, the bureau of cavalry adopted a regulation that horses presented for inspection should remain at the expense of the contractor one day in the inspection yard, and that horses presented for inspection which were a manifest fraud on the government should be branded with the letter **R.**.  Under this new rule, the owners of the horses would not furnish them to A. to be sent forward and inspected.  Whereupon A., without delivering, buying, or tendering any horses to be inspected, under *any* rules, even the old, abandoned his contract and sued the government for what profits he *might* have made had the old rules remained, and had he bought and delivered the horses under them.  *Held* that he could recover nothing.

5. The adoption by the bureau of cavalry of the new regulation did not render it impossible for the contractor to purchase and deliver the number of horses which he had agreed to deliver.

6. Nor did the adoption of those rules, after the contract was made, authorize the contractor to abandon his contract and sue for the profits which he might have made, though he neither bought, nor delivered, nor tendered any horses, as he had agreed to do.

7. Such new rules did not disable the government from receiving and paying for the horses, nor was it a notification that the government would not have them.

8. A party binding himself to deliver personal property can only be relieved in this respect on the ground of clear refusal of the other party to receive or becoming disabled to perform his part of the contract.

APPEAL and cross-appeal from the Court of Claims; the case being thus:

On the 5th of February, 1864, Smoot entered into two contracts with the War Department through Eakin, quartermaster; one to deliver within forty days 2500 cavalry horses *at St. Louis,* and the other to deliver within fifty days 2000 like horses at Chicago, at the government stables in each place; of certain qualifications set forth in the contracts, and subject to the inspection provided for in one article of the contract, which was as follows:

"It is agreed that the horses, upon being delivered, shall be examined and inspected without unnecessary delay, by a person or persons appointed by the United States, and after such inspector shall have certified that they are in all respects as contracted for, and fully equal to the specifications aforesaid, they shall be received and become the property of the United States; and all such horses as may be condemned and rejected by said inspectors, shall be removed from the government stables within *one day* after the contractor shall have been notified of said rejection."

Payment for the horses was to be made on completion of the contract, should Congress have made an appropriation for that purpose; otherwise as soon thereafter as funds might be appropriated.

During the existence of the contracts Smoot was possessed of means and credit to comply with the stipulations on his part, and he and his agents went to Chicago and other parts of the West to make, and did make, all necessary arrangements to carry them out, except the actual procuring of the horses.

At the time the contracts were entered into, and long prior thereto, the mode of inspection of horses purchased by the government had been for horses to be presented and immediately examined in the presence of the owner, and if satisfactory, they were accepted, and if unsatisfactory, they were rejected and returned to the owner without delay, expense, or blemish.

By an order, however, dated on the same day as these contracts, but not promulgated in Chicago or St. Louis until the 1st of March, or known to the defendant till then, the government ordered another and different mode of inspection from what had been the practice and custom of the government theretofore. This new order ran thus:

"Each horse shall be placed in the inspection yard twenty-four hours before inspection, after which time, every person, except the inspector and his assistants, are to leave the yard, not to re-enter it or handle the horses until the inspection and branding has been completed.

"All horses presented that are manifestly an attempt at fraud on the government because of any incurable disease or any distemper whatever, shall be branded on the left shoulder with the letter **R.**

"Horses that are rejected for being under age, in poor condition, or temporarily injured by transportation or otherwise, shall be lightly branded on the front hoof, near the coronet, with the letter **R**, not to exceed three-quarters of an inch.

"Any horse once rejected, that is presented to the government without notice of that fact, shall be considered and deemed fraud upon the government, and branded on the left shoulder as fraud.

"When horses are doubtful before branding, they may be kept three or four days under guard, *at the expense of the contractor*, and then disposed of by branding or otherwise, as the inspector may determine.

"No mares will be accepted."

At the time the contracts were entered into, and for a long time prior thereto, the usual course of business in filling contracts of this kind, had been for the contractor to buy his horses subject to government inspection, and one effect of the order of the new rules of inspection was to create a change in this course of business, and, therefore, no horses could be purchased by contracts subject to the new inspection.

Another effect was to impose upon the contractors considerable risk, in consequence of the horses being injured by kicks and bruises; by contagious diseases; by loss of identity, in putting the animals with other parcels of horses, so that in the event of rejection the same animals could not be returned; by the expense of keeping the animals during the four days; by injury which might occur to them from being branded by hot iron; the branding of a rejected horse in the manner prescribed by the new order greatly lessening his market value.

Upon ascertaining the effect produced by the new order of inspection, Smoot caused application to be made at the office of the bureau of cavalry, in Washington, for a modifi-

cation of it, and repeatedly offered to go on and fill the contracts if the objectionable features of the order should be removed. The chief of the bureau was then absent. The next officer in rank referred the matter to the chief, who was expected to be in Chicago soon to decide the matter there. The chief of the cavalry did soon after arrive in Chicago, and the matter was presented to him by *several other contractors* who were in the same position as Smoot, but the chief decided not to revoke or modify the order. Neither Smoot nor his agent saw the chief of the cavalry in Chicago, but his decision was communicated to Smoot.

Smoot was able and willing to perform his contract by delivering the horses within the time prescribed by it, subject to the inspection prescribed by the contract, but was unwilling to deliver any horses subject to the inspection required by the new order. *He did not possess any horses in Chicago, nor tender any to the government* at that place, nor apply there to the chief of the cavalry bureau to waive the inspection ordered; but he possessed ample time and means for procuring horses, and he regarded the order as a renunciation by the government of its agreement.

So far in regard to the horses deliverable at Chicago.

The same facts existed as to the contract for St. Louis as to the contract for Chicago, except that the new order was not enforced at St. Louis as against contracts dated prior to its promulgation. Of this fact, however, Smoot had no knowledge, but believed that the order was enforced there, as well as in Chicago. He did not ask the inspecting officers in St. Louis anything about the matter, and did not attempt to transport horses to St. Louis, in accordance with his contract.

Smoot not fulfilling his contract was arrested by the government, under an act of Congress passed in the exigencies of the rebellion,* fined $10,000, and put into Fort Delaware for a wilful neglect of duty. He was afterwards, however, on an examination of the case by the Judge Advocate General released.

* Act of July 17th, 1862.

The Court of Claims having found a case essentially as above, and that the fair profits which Smoot would have made on the 2000 horses to be delivered at Chicago, if he had been allowed to perform his contract according to its terms, would have been $10 a horse, gave him on that contract $20,000.

On the St. Louis contract, the court decided in favor of the government. In the Chicago contract the government appealed; in the St. Louis one, Smoot.

*Mr. B. F. Butler, for the claimant, Smoot:*

The findings in this case are so far different from those in *United States* v. *Wormer*,[*] as to warrant us bringing it before the court for consideration.

1st. *In regard to the contract for Chicago; the appeal by the United States.* The question is whether the new order of the government, so onerous and impracticable of execution as to have rendered the performance of the contract impossible by Smoot, is, in law, a breach of the contract on the part of the government, so as to render the United States liable for such damages as may be proved to be sustained by the contractor; damages which the court below have found to be $20,000.

There needs neither citation of authorities nor argument to prove, if one party to a contract, by his own act, interposes and enforces onerous conditions upon the manner of the performance of a contract not contemplated by the other party thereto at its inception, and refuses to permit its performance unless those conditions are complied with, that a breach of the contract is thus made by the party so refusing, and he is liable to the party capable and willing to perform on his part, not only for all that he has lost in attempting to perform, but for all the fair profits he would have made in its performance.

Neither the government nor an individual can be permitted to alter any essential element of a contract after it

---

[*] 13 Wallace, 25.

has been entered into *a fortiori*, when, as in the case at bar, the conditions so imposed render the performance of the contract impossible.

In Wormer's case but two facts were found bearing on this point: *first*, the contract; *second*, the order of inspection; and the court was asked, as a matter of law, to infer, as did the court below, that the regulations of the inspection were "*unreasonable.*" This clearly was a matter of *fact*, and not of *law*. The order of inspection could not be known to the court to be unreasonable as a matter of fact. The case was silent on that subject. It did not appear in that case even that, by the new order, there had been any substantial change from the former custom and practice of the government in the inspection of horses, or that the changes, if any had been made, bore onerously on the contractors.

Now, in this present case, the order of inspection was found to be impracticable of execution, so that at St. Louis it was not enforced. It was relaxed as to the only other contractor who did perform his contracts.

2d. *As to the contract for St. Louis; or the appeal by Smoot.* This stands upon a precisely similar contract in all material provisions as the other. The distinguishing fact, upon which it would seem that the court below must have found against Smoot, was, that he did not apply at St. Louis for *a modification of the order of inspection*, nor buy and transport to St. Louis any horses in fulfilment of the contract. The only question of law, if the court sustain our views in the case of the contract at Chicago, which can arise here, is whether, under the facts stated, Smoot was bound to tender horses at St. Louis, or apply there for the disobedience of the order of inspection. The case shows that the order was suspended by the subordinate officers there as to another contractor; but it also shows that Smoot applied to the War Department for its relaxation, and was referred to the chief of the cavalry bureau at Chicago for his answer, and there learned that it would not be modified or relaxed. And no reason, in fact or law, is found why it should be suspended at St. Louis if not in Chicago. Was Smoot, then, bound to apply

at St. Louis in expectation that the order would be there disobeyed? This was an order from the War Department, solemnly promulgated for the direction of the whole government in this regard. He had applied to that department, been referred to the chief officer of the proper bureau for his answer, and had received it. Could he then, in law, be compelled to apply at St. Louis for a suspension of the order by the subordinates there? Had he not a right to suppose that the order, being a general one, would be generally enforced where no reason appeared for the exception?

If, then, he was not obliged to apply for a modification of the order at St. Louis, would the law compel him to put himself to great expense to attempt the impossibility of performing his contract there?

*Mr. G. H. Williams, Attorney-General, Mr. C. H. Hill, and Mr. W. McMichael, Assistant Attorneys-General, for the United States,* argued that the case was not distinguishable from *United States* v. *Wormer;* which might have been decided on the ground that there was no tender, nor any evidence even that Wormer had any horses; a position which certainly disposed of Smoot's claims in both cases here.*

*Reply.* Of what use was an actual tender? If A. contract to build a brick house for B., and B., when A. is getting ready to build it, gives him notice that he will not have any such house on his ground, nor any house but a stone one, is A. bound to cart bricks to B.'s land and insist on putting up the brick house? In the present case the refusal to modify the government order was a sufficient refusal. After this refusal, why was Smoot bound to put himself to the trouble and expense of driving 2000 horses from all parts of the West to the city of Chicago, only to be there turned away, *ad vana lex neminem cogit?*

Mr. Justice MILLER delivered the opinion of the court.

Mr. Smoot claims of the United States a large sum of

---

* Smith's Leading Cases, 7th American edition, 42, 43; note to Cutter *v.* Powell; Benjamin on Sales, 423.

money for the profits which he might have made out of two contracts with Quartermaster Eakin, for delivering cavalry horses for the use of the army—two thousand five hundred at St. Louis and two thousand at Chicago. It is neither alleged nor proved that he ever tendered a horse at either place, or attempted otherwise to perform his contract, or that he was ready to do so, or that he owned any horses, or had expended a dollar in preparing to fulfil his contract. The proposition on which the claimant rests his right to these speculative profits is not on account of anything he had done, or offered to do towards performance, or any actual loss suffered, but that after the contract was made, the cavalry bureau of the War Department adopted and published rules governing the inspection of horses purchased for that service, differing from those in use at the time the contract was made. It is not asserted that these rules required a higher or more difficult standard of quality in the horses, but that the mode in which that standard was to be ascertained was so changed as to impose a greater hardship, or burden, upon the contractor. Nor is it claimed that these new regulations were adopted with special reference to their application to Smoot's contracts. They were a new regulation of the business of inspection of a general character. The contracts sued on, which are identical, except in the number of horses and the place of delivery, provided for an inspection. But it is argued that the new regulations were not only a departure from those in use when the contracts were made, and imposed an additional burden on the contractor, but that conceding the right of the bureau to make proper and reasonable regulations for inspection, these were unreasonable and improper. The two points of difference in the new and the old mode of inspection most earnestly pressed in the argument are:

1. That by the new regulations the horses offered must remain at the expense of the contractor twenty-four hours in the inspection yard, into which no other person than the inspector and his assistants shall be permitted to enter until the inspection is completed.

2. That all horses presented for inspection that are manifestly an attempt at fraud on the government, because of incurable disease, or any purposely concealed defect whatever, shall be branded on the left shoulder with the letter **R.**

The argument founded on these rules is presented under two propositions:

1. That the adoption of them by the cavalry bureau rendered it impossible for the contractor to perform his contract, because no owner of horses would sell to him subject to have them branded as a fraud by inspectors of whom he knew nothing, and who might be incompetent or oppressive.

2. That the application of these rules to horses tendered under claimant's contract absolved him from the obligation of performance, or tender, or offer to perform, and left him at full liberty to sue for the profits which he had done nothing to earn beyond making the contract.

There is in a large class of cases coming before us from the Court of Claims a constant and ever recurring attempt to apply to contracts made by the government, and to give to its action under such contracts, a construction and an effect quite different from those which courts of justice are accustomed to apply to contracts between individuals. There arises in the mind of parties and counsel interested for the individual against the United States a sense of the power and resources of this great government, prompting appeals to its magnanimity and generosity, to abstract ideas of equity, coloring even the closest legal argument. These are addressed in vain to this court. Their proper theatre is the halls of Congress, for that branch of the government has limited the jurisdiction of the Court of Claims to cases arising out of contracts express or implied—contracts to which the United States is a party in the same sense in which an individual might be, and to which the ordinary principles of contracts must and should apply.

It would be very dangerous, indeed, to the best interests of the government—it would probably lead to the speedy abolition of the Court of Claims itself—if, adopting the views so eloquently urged by counsel, that court, or this, should

depart from the plain rule laid down above, and render decrees on the crude notions of the judges of what is or would be morally right between the government and the individual.

In illustration of this course of observation the proposition that the regulation concerning branding the horses fraudulently presented for inspection made it impossible for the contractor to perform his contract, may be well cited.

As between individuals, the impossibility which releases a man from the obligation to perform his contract must be a real impossibility, and not a mere inconvenience. And while such an impossibility may release the party from liability to suit for non-performance, it does not stand for performance so as to enable the party to sue and recover as if he had performed.

The argument on this branch of the subject in the case before us loses sight of these principles.

There was no impossibility. It is a mere inconvenience. If the contractor has the money and purchases his horses before he offers them for inspection, there is presented no obstruction whatever, by the rules of inspection, in obtaining the required number of horses. It is only because he desires to transfer the risk and loss of rejection from himself to the parties of whom he purchases, that he has difficulty. The government made no agreement with him to protect him in this way. His ability to buy horses that would pass inspection was a part of the responsibility that he assumed, and which it was by no means impossible to perform, if he had the money and was ready to pay when he bought the horses of their original owners. Certainly no such circumstance as this would be set up for a moment in an ordinary suit between individuals as an impossibility, which released the party from his contract.

But suppose the contract had been between private parties, and an epidemic had prostrated every horse in the country with disease for the forty days allowed to buy and deliver sound horses by this contract. Will any one assert that this would authorize the contractor to sue for the profits he could

have made, if no epidemic had occurred, though he neither then nor afterwards bought, or delivered, or tendered a horse? While such a public misfortune might possibly (we do not say it would) have been a defence to a suit against him for non-performance, it could be the foundation of no claim on his part to recover as if he had performed.

Perhaps no class of contracts has been more frequently the subject of judicial consideration than those for the future delivery of personal chattels. Such a contract is this. A contract in which the delivery is a condition precedent to payment; for the provision is that the delivery is to be at Chicago and St. Louis, and the payment made afterwards at Washington; and the time of payment is expressly made dependent upon appropriations made or to be made by Congress.

In approaching the inquiry into the effect which the action of the bureau of cavalry, in adopting these new rules for inspection, had upon the rights of the parties to this contract, let us endeavor to free ourselves from the consideration that the government was one party to the contract, and that it was for a large number of horses; 'for we hold it to be clear that the principles which must govern the inquiry are the same as if the contract were between individuals, and the number of horses one or a dozen instead of four thousand. The increased difficulty arising from the number to be delivered in a given time was voluntarily assumed by the contractor, and he had the right, during the forty or fifty days allowed him, to deliver any number, smaller or greater, at one time.

We are also to remember that the question to be considered is not whether the action of the cavalry bureau would have been a defence if the claimant had been sued for a failure to perform his part of the contract, but whether it was sufficient to authorize him to abandon the contract himself, and as a plaintiff recover against the other party the profits which he would have made if it had been fully performed.

With these views before us the regulations adopted can only have the effect claimed upon one or two grounds;

namely, as a notification by the government that it refused to receive the horses according to the terms of the contract, by which refusal the other party was released from his obligation to tender; or that the government had disabled itself from complying, and therefore the other party was not bound to tender. The most recent work, and a very able one, on "The law of sales of personal property," lays down the rule on this subject as follows: "A mere assertion that the party will be unable, or will refuse to perform his contract, is not sufficient; it must be a distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made; for if he afterwards continue to urge or demand a compliance with the contract, it is plain that he does not understand it to be at an end."* The English cases cited abundantly sustain the proposition. *Avery* v. *Bowden*, in the Court of Exchequer,† affirmed in the Exchequer Chamber,‡ is very much in point. It was an action arising out of a charter-party, one of the covenants in which was that the vessel should be at Odessa, and lay there forty running days, within which time the shipper was to furnish her cargo, unless war should be sooner declared between Russia and Great Britain. The vessel came to Odessa on the 11th March, and sailed away in ballast on the 17th April. It was proved that at four different times during this period the officers of the ship applied to the agent of the charterer for cargo, who said, "We have none for you," and at last said, "I have no cargo for you; you had better go away."

On this testimony a verdict was taken for the plaintiff, the ship-owner, subject to the judgment of the court on the law of the case. The judges, both in the Exchequer Court and in the Exchequer Chamber, were unanimous in the opinion that this conduct of the agent did not relieve the plaintiff from the obligation to remain the forty days, and that on that count he could not recover.

In the case of *Phillpotts* v. *Evans*,§ the defendant, who had

---

* Benjamin on Sales, 424.          † 5 Ellis and Blackburn, 714.
‡ 6 Id. 953.                        § 5 Meeson and Welsby, 475.

agreed to receive and pay for wheat, notified the plaintiff,
before the time of delivery, that he would not receive it.
The plaintiff tendered the wheat at the proper time, and the
only question raised was, whether the measure of damages
should be governed by the price of wheat at the time of the
notice or at the time of the tender. Baron Park said: "I
think no action would have lain for the breach of the contract
at the time of the notice, but that plaintiff was bound to wait
until the time of delivery to see whether the defendant would
then receive it. The defendant might have chosen to take
it and would have been guilty of no breach of contract. His
contract was not broken by his previous declaration that he
would not accept."

And though some of the judges in the subsequent case of
*Hochsteer* v. *De La Tour*[*] disapprove very properly of the
extreme ground taken by Baron Park, they all agree that
the refusal to accept, on the part of the defendant, in such
case, must be absolute and unequivocal, and must have been
acted on by the plaintiff.

In the case before us there was no such refusal. The
officers of the government required of the plaintiff at all
times the delivery of the horses of the kind and quality
which he had agreed to deliver. And so far from refusing to
accept, or intending to release the plaintiff from his obliga-
tion to deliver, it is found as a fact in the case that he was
arrested and imprisoned by the military authorities for re-
fusing to deliver the horses.

Nor can it be maintained that those regulations disabled
the government from performing its contract. They were
just as ready to accept and as able to pay for the horses,
notwithstanding the regulation. It may be said that the
regulation tied the hands of the government officers so that
they could only accept horses inspected under it, and that to
such inspection the plaintiff was not bound to submit. But
to this proposition the remark of Baron Park is peculiarly
applicable. The government was not bound to apply to

[*] 2 Ellis and Blackburn, 678.

horses furnished under a previous contract these subsequent regulations. They were general in their terms and were not adopted with a special view to these contracts. And the declarations of certain officers that they would be governed by them bound nobody. The correctness of this view is strikingly illustrated in this case, for the Court of Claims finds that the officers receiving cavalry horses at St. Louis did receive horses on all contracts made previous to the adoption of the new regulations under the old mode of inspection, and did not apply to them the objectionable rules, and for that reason they reject Smoot's claim as to the contract to deliver at St. Louis.

We think it was equally his duty to have tendered horses at Chicago, and if the new regulations would have relieved him at all from that duty, it would have been after he had made a tender, and objected to the application of the new rule of inspection, and the proper officer had refused to receive the horses without subjecting them to those rules. Until then he could not justly claim that the government had violated its contract.

In Mr. Smoot's case, he never had any declaration made to him or his agent from any one in charge of the execution of those contracts on the part of the government, that the rule would be applied to him or his contract. He accepted and acted upon declarations made to other parties and not to himself.

We do not, however, believe that this would have varied the matter. It would have been no great hardship for him to have so far attempted compliance with his contract as to have tendered twenty or fifty horses under it, and tested the action which the government officers would take when he was thus attempting to fulfil his contract and objecting to the application of the new rule. Then the officers of the government would have been legally called on to determine whether they would apply them or not. Until that time they were under no obligation and had no right to commit themselves or others irrevocably on that subject.

On these grounds we think that the claimant had no right

to recover on either of the contracts sued on.   It follows that the judgment of the Court of Claims in favor of Smoot on the Chicago contract is REVERSED, and the case remanded for judgment in favor of the United States; and the judgment of that court on the St. Louis contract, the subject of the appeal by Smoot, is

AFFIRMED.