BUYS v. TRAVIS.

1. CONTRACTS—RESCISSION—REFUSAL TO PERFORM.
   A refusal to fulfil a contract must be absolute, in no way qualified, and substantially amount to an avowed determination not to abide by it to be equivalent to an assent to its dissolution authorizing the other party to rescind.

2. TRIAL—DIRECTED VERDICT.
   In considering plaintiffs' right to a directed verdict, the record must be given the construction most favorable to defendant.

3. CONTRACTS — REFUSAL TO PERFORM MUST BE ABSOLUTE TO JUSTIFY RESCISSION BY OTHER PARTY.
   To justify one party in terminating a contractual relation, there must be a distinct, unequivocal, and absolute refusal by the other party to perform, and such refusal must be definitely and finally acted upon by the party rescinding.

---

As to what constitutes performance of contract by real estate broker to find a purchaser or effect an exchange of his principal's property, see annotation in 44 L. R. A. 593.

On ability and willingness to pay within rule as to broker's right to commissions, see annotation in 1 A. L. R. 528.

4. BROKERS—COMMISSIONS—WHETHER RESCISSION JUSTIFIED QUESTION FOR JURY.

In an action by brokers for commissions on a contract for exchange of property, whether defendant was justified in rescinding the contract on a statement which he claims was made to him by the broker's agent that it was an absolute impossibility for the other party to furnish a surety company bond guaranteeing rentals on property, as required by the contract, *held*, for the jury, where the agent denied the statement.

5. SAME—WHETHER PERSON PROCURED WAS ABLE, ETC., QUESTION FOR JURY.

Where there was conflicting testimony as to whether the brokers procured a person who was able, willing, and ready to consummate a contract for exchange of properties with defendant as provided therein, said question was properly submitted to the jury.

Error to Clinton; Searl (Kelly S.), J. Submitted May 2, 1928. (Docket No. 140, Calendar No. 33,556.) Decided July 24, 1928.

Assumpsit by James Buys and John Buys, copartners as Kinsey & Buys Company, against Frederick A. Travis for commissions on a contract for an exchange of real estate. Judgment for defendant. Plaintiffs bring error. Affirmed.

*Corwin, Norcross & Cook,* for appellants.

*Smith, Hunter & Spaulding,* for appellee.

NORTH, J. James Buys and John Buys, copartners, doing business as Kinsey & Buys Company, brought this suit to recover from the defendant, Frederick A. Travis, certain commissions for an exchange of real estate which the plaintiffs claim they earned under the terms of a contract dated August 16, 1926. The plaintiffs had in their employ a Mr. Fred Dunn, and through him this contract was negotiated between the

defendant herein and Mr. Carl Zarbock. The contract provided for an exchange of the defendant's farm of 262½ acres, located in Clinton county, for property known as the "Zarbock block" in the city of Grand Rapids. The defendant signed this contract on the 16th day of August, 1926. By the terms of the agreement the plaintiffs herein had until August 20, 1926, in which to secure Zarbock's signature, and the transaction was to be wholly consummated on or before September 1, 1926. In this agreement signed by the defendant it was provided that he should pay to the plaintiff incident to the transaction a commission of $1,700, and Zarbock agreed to pay a commission of $1,850. One paragraph of the instrument reads as follows:

"Signed with the understanding that a rental of $350 per month is guaranteed by corporate surety bond given by the owner of block for a period of three years from October 1, 1926."

The agreement was signed by the defendant at his home in St. Johns, Mich., and immediately thereafter Mr. Dunn returned to Grand Rapids, and, after informing Mr. Zarbock of the terms upon which the defendant would exchange properties, the abstract of the Zarbock property was forwarded to the defendant and steps taken by the plaintiffs to complete the transaction. Mr. Dunn had a telephone conversation with Mr. Travis on August 18th and also on August 19th. It is the claim of the plaintiffs that, incident to the conversation on August 19th, the defendant attempted to withdraw his offer to exchange properties, and that he thereafter refused to perform the contract for the exchange of properties, and that in consequence thereof the plaintiffs lost the commissions which they otherwise would have received, totalling $3,550. In this connection it is claimed by the plaintiffs that they secured in Mr. Zarbock, who signed the agreement for

the exchange of properties on August 20th, a party who was ready, willing, and able to carry out the transaction in accordance with the agreement signed by the defendant.   On the part of the defendant it is claimed that as the result of a telephone conversation on August 18th the whole transaction was abandoned by the common consent of the parties concerned; and that in any event the testimony in the case shows the plaintiffs did not procure in Mr. Zarbock a man who was able, ready, and willing to perform the terms of the agreement for the exchange of properties which the defendant had signed.   Upon trial by jury a verdict of no cause for action was returned.   The plaintiffs review by writ of error.

The controversy between these parties relates largely to the paragraph of the agreement above quoted, by which it was provided that Zarbock should give a corporate surety bond to guarantee rentals of the Grand Rapids property in the amount of $350 per month for a period of three years.   The defendant claims that in the telephone conversation had between himself and Mr. Dunn on the 18th he was advised by Mr. Dunn that it was "an absolute impossibility" for Mr. Zarbock to give the bond specified in the agreement, and that thereupon the defendant told Mr. Dunn he would withdraw his offer and that he was through, but finally, at the request of Mr. Dunn, the defendant agreed to consult with his (the defendant's) attorney about the matter.   The defendant testified -that in a telephone conversation on the following morning he again told Mr. Dunn that there was no change in his attitude.   His testimony is:   "I told him I had withdrawn my offer the day before, and I was through."   The defendant claims that the entire transaction then pending between them was thus closed.   Its termination in this manner is denied by the plaintiffs.   Their version of the telephone conver-

sations is that they merely requested the defendant to accept collateral security in lieu of the bond, and that the defendant thereupon attempted to withdraw his offer to exchange properties. The plaintiffs moved for a directed verdict and now urge that there was no testimony to justify the trial court in submitting to the jury the question of the abandonment of the contract by the parties.

Counsel for appellants have submitted a carefully prepared brief on this phase of the case. The difficulty with which we are confronted does not arise from · any difference of opinion as to the law, but rather from its application to the facts in this case.

"The law seems to be settled that a refusal to fulfil a contract must be absolute to be equivalent to an assent to its dissolution, and to authorize the other party to rescind it; such refusal must be in no way qualified, and should substantially amount to an avowed determination of the party not to abide by the contract." *Hoggson Bros.* v. *National Bank*, 231 Fed. 869; citing many cases.

In *Goldwyn Distributing Corp.* v. *Brenneman*, 13 Fed. (2d) 105, it is said:

" 'But a mere assertion that the party will be unable or will refuse to perform his contract is not sufficient; it must be a distinct and unequivocal, absolute refusal to perform the promise and must be treated and acted upon as such by the party to whom the promise was made; for, if he afterwards continue to urge or demand compliance with the contract, it is plain he does not understand it to be at an end.' Benjamin on Sales (7th Ed.), § 568; *Smoots Case*, 82 U. S. 36; *Dingley* v. *Oler*, 117 U. S. 490 (6 Sup. Ct. 850)."

The same rule of law is stated in 2 Mechem on Sales, § 1087, as follows:

"Where, before the time arrives for the performance of the contract by one party, the other absolutely and unqualifiedly announces that he will neither receive such performance by the former nor perform on

his own part, the former may, if he desires, consider himself as absolved from his duty to perform. This renunciation by the other party, however, must be more than a mere threat of nonperformance, and *a fortiori,* more than mere idle talk of not performing; it must be a distinct, unequivocal and absolute refusal to receive performance or to perform on his own part."

Tested by these rules of law, we are of the opinion that the proofs in this case presented an issue of fact for the jury as to whether there was a justifiable withdrawal from the contract by the defendant. In considering plaintiffs' right to have a verdict directed in their behalf, the record must be given the construction most favorable to the defendant. Concisely stated, the testimony is that the plaintiffs through their employee, Dunn, informed the defendant that it was "an absolute impossibility for him (Mr. Zarbock) to give the bond" which was required by the terms of the contract; that thereupon the defendant immediately informed the plaintiffs' agent that he was through and would withdraw his offer. In a telephone conversation the following morning the plaintiffs were again assured that the defendant's withdrawal was final, in view of the statement that it was "absolutely impossible" for Zarbock to perform his part of the contract. There is no testimony which tends to show that the defendant at any time thereafter indicated an intention or even a possibility of his departing from this position. This complies with the rule that, to justify a party in thus terminating a contractual relation, there must be a distinct, unequivocal, and absolute refusal by the one party to the contract to perform, and such refusal must be definitely and finally acted upon by the other party to the contract. It is self-evident that a declaration that it is "absolutely impossible" for one to perform a contract is equivalent to saying he positively will not perform. The testimony on this phase of the case was conflicting, and

the circuit judge properly submitted the issue to the jury.

Plaintiffs' right to have a verdict directed in their favor also involved the question as to whether there was any dispute in the testimony as to the plaintiffs' having procured in Mr. Zarbock a person who was able, willing, and ready to consummate the exchange of properties provided for in the agreement signed by the defendant. The plaintiffs assert that they were entitled to a directed verdict because the undisputed proof shows that within the time limit they procured and held ready for delivery a properly executed deed of Mr. Zarbock's property conveying the same to the defendant in accordance with the executed agreement, and they also had a written statement from a surety company saying that the company would execute the bond guaranteeing the rentals on the Zarbock property. The defendant claimed that these papers were prepared after the transaction had been abandoned and for the purpose of enabling the plaintiffs to make a case in court. The deposition of Mr. Zarbock was taken by the defendant, and the following extracts therefrom are pertinent to this phase of the case:

"I know we only signed one agreement and that was after Mr. Travis refused to deal.  *  *  *

"Q. If the deal was off, as you have stated, then why did you sign a deed after you came back?

"A. Well, I don't know, because Mr. Dunn he told me he could get the deal through anyway, and some way make some different arrangement with Mr. Travis.

"Q. Whether or not you ever reported to Mr. Dunn that you would not sign such a bond?

"A. I think there was a talk between me and Mr. Dunn and Mr. Buys, they would go to work and furnish the bond to guarantee Mr. Travis $350 a month rent. That is providing they could get the deal through with Travis.

"Q. When was this?

"A. After the meeting at St. Johns when I signed

the deed. I think it was some time—I think two or three weeks, four weeks afterwards—I don't agree to furnish no bond and I couldn't and I told him so from the start.

"*Q.* Did you, when you signed this agreement, sign it with the understanding you would give a bond guaranteeing rentals of $350 per month? (Objection by plaintiffs.)

"*A.* No, that was not agreed and not in there. There was no bond and no change in the agreement after we came back from St. Johns when we couldn't agree, and the deal was off on that account. I would not give a bond or agree to have a bond given.

"*Q.* Mr. Zarbock, then when you signed this exhibit No. 1 (the agreement) whether or not you understood you or anybody else was to give a bond guaranteeing the rent on these buildings that you were trading?

"*A.* The time I signed those papers—no, sir."

There is further testimony of like character from this witness. If, as Mr. Zarbock testified, some of the essential details of his part of this exchange of properties were not consummated until three or four weeks after the trip to St. Johns, the arrangement would not have been consummated within the time limit provided in Mr. Travis' agreement. And further, the inference may fairly be drawn from Mr. Zarbock's testimony that he did not at any time understand or agree that he was to give a bond of the character specified in the agreement. We think the record was such that it would have been error on the part of the trial court to have refused to submit the *bona fides* of this phase of the case to the jury as a question of fact, and therefore a verdict could not have been directed in favor of the plaintiffs.

We have given due consideration to other assignments of error contained in the record, including the plaintiffs' claim that the verdict is contrary to the weight of the evidence and that there was error in the charge of the court and in the refusal to give certain requests preferred by the plaintiffs. These

assignments have not been stressed in plaintiffs' brief, and we are of the opinion that they are without merit, and that the controlling issues in the case were issues of fact, and these were fully and fairly submitted to the jury. The verdict was adverse to the plaintiffs and we find no justification for disturbing the result.

The judgment of the lower court is affirmed, with costs to the appellee.

FEAD, C. J., and FELLOWS, WIEST, CLARK, POTTER, and SHARPE, JJ., concurred. McDONALD, J., did not sit.