XAVIER ZEQUEIRA, Plaintiff, Appellee and Appellant, *v.* MUNICIPAL HOUSING AUTHORITY OF THE CAPITAL OF PUERTO RICO, now URBAN RENEWAL AND HOUSING CORPORATION, Defendant, Appellant and Appellee.

No. 12378. Decided November 22, 1961.

*Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella, C. Morales, Jr., Elí B. Arroyo,* and *Federico Ramírez Ross* for plaintiff, appellee and appellant. *James R. Beverley, R. Castro Fernández* and *Francisco Castro Amy* for defendant, appellant and appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, and Mr. Justice Santana Becerra and Mr. Justice Blanco Lugo.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

We are agreed with the trial court that in this case contractor Zequeira was bound to make the finishings on the concrete surfaces of the buildings of Luis Lloréns Torres project, pursuant to the interpretative letter of September 15, 1950 and not in accordance with the contract signed by the parties on September 12, 1950. The finding of fact that "when the contractor terminated the construction of the walls of buildings C-E, 9-E, and 10-B and submitted them to the defendant Authority for inspection and acceptance and in order that it could certify that the corresponding work was terminated, the supervising engineer of the construction and defendant's representative in that project informed the plaintiff that he could not accept them, and that before accepting

them they had to be finished as required in the description of the interpretative letter of September 15, 1950," is the most correct version of the evidence admitted on this point. The plaintiff proceeded to make the finishings on the concrete surfaces of the remaining buildings as required by the defendant.

 We are likewise agreed with the trial court that this action has not prescribed, regardless of whether we consider the time limitations provided in the contract for the different claims or the periods of ordinary civil prescription for actions derived from the implied obligations or from the unjust enrichment.

We are further agreed with the trial court that pursuant to § 1240 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3478, "the interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity," particularly in the case of the so-called adhesion contracts, *i.e.*, those contracts in which only one of the parties prescribes the conditions of the contract to be accepted by the other, a situation typical of a public-works contract in which the general conditions are embodied in a model or form prepared beforehand by the property owner.

 The fact that this is the contract between the State and an individual is no exception. According to the holding in the case of *Rodríguez* v. *Municipality*, 75 P.R.R. 449, 464 (Belaval, 1953), "When a government has a contract with an individual, it must be construed as if it were one between individuals: *United States* v. *Smoot*, 15 Wall. 36, 21 L. Ed. 107 (Miller), (1873); *The Amoskeg Manufacturing Company* v. *United States*, 17 Wall. 592, 21 L. Ed. 715 (Miller), (1873); *Reading Steel Casting Co.* v. *United States*, 268 U.S. 186, 69 L. Ed. 907 (Butler), (1925)". See, also, *Lynch* v. *United States*, 292 U.S. 571, 579, 78 L. Ed. 1434, 1440 (Brandeis, 1934); *S.R.A.* v. *Minnesota*, 327 U.S. 558, 564,

90 L. Ed. 851, 857 (Reed, 1946) ; *Woodbury* v. *United States,* 192 F.Supp. 924, 935 (Kilkenny, 1961).

■ We know that an adhesion contract presents the phenomenon of a reduction of the contractual bilaterality to the minimum. Or, as stated by Castán:

"The modern doctrine, as of Saleilles, has labelled adhesion contracts those contracts in which the contents, *i.e.*, the regulatory conditions, are the doings of only one party, so that the other contracting party contributes nothing to the formation of the contractual contents, thereby substituting the usual bilateral determination of the contents of the bond by the mere act of accepting or adhering to the unilaterally predetermined plan.

"This type of contracts is linked to the economic phenomenon of the privileged position which, for different reasons (for example, in order to exercise a monopoly of law or of fact), one of the parties has with respect to the other. In this sense Messineo defines the contract of adhesion as a contract in which the economically strongest party imposes specific conditions or the full scheme of the contract, to his advantage and in detriment to the other contracting party who, being economically weaker, has no freedom of choice other than to accept those conditions or scheme or refuse to enter into the contract.

"Contracts of insurance, transportation, water, gas and electricity services, banking contracts, etc., are very frequent cases of adhesion contracts.

"With respect to such contracts, on which there is abundant literature, the problem of their juridical nature and of their effects and interpretation has been object of great concern.

"With respect to their nature, there have been doubts as to whether the adhesion contract is a true contract or rather a unilateral act or an act of a nonunitarian structure. However, the prevailing opinion decides the question in the former sense, based correctly on the fact that the adhesion implies consent and is sufficient for the formation of the contract.

"With respect to the effects, it is sought to determine—inasmuch as the grave dangers which, as compared with the indubitable advantages derived by the enterprises and even the general economy, by reason of celerity, uniformity, etc., the adhesion contracts cause the public are notorious—what pre-

ventive measures or juridical, legislative, or judicial reaction may prevent the iniquities to which this type of contracts lends itself, securing the contractual equilibrium which the economic hegemony of the large enterprises tends to destroy.

"Modern legislation give us already an example of that legislative intervention by enacting general provisions limiting the effectiveness of the clauses unilaterally pre-established by the enterprises (see § § 1,341 and 1,342 of the new Italian Civil Code), or, simply, special provisions for specific contracts (for example, provisions on administrative fiscalization of insurance).

"It is more doubtful whether the judges have means, once the adhesion contracts are executed, to prevent the injustice done by them. It has been held that in such contracts the judge has an exceptional power of interpretation authorizing him not to apply the clauses of the contract except in consideration of the particular situation of the parties, and also the power to review which would authorize him to modify the contract in the portion which may appear to be unfair. But it would be very venturesome to presume that, in view of the silence of the law, a proper juridical nature may be attributed to adhesion contracts which will prevent the nonapplication to them of the general conditions of the contracts. Fortunately, in our law there is basis in the Civil Code for applying to the contracts in question a special rule of construction. Since the enterprise which prescribed the conditions of the contract is probably responsible for the inaccuracy or vagueness in its clauses, such enterprise must bear the consequences according to § 1288 (our § 1240).

"With reference to the insurance contract, the judgment of December 13, 1934, affirmed by that of February 27, 1942, held that where there is a vague clause it should be borne in mind that insurance is particularly an adhesion contract, and, hence, in case of doubt on the meaning of the general clauses of a policy drawn up by the company without any intervention of its insureds, there should be adopted pursuant to the rule in § 1288 of the Code (our § 1240), the interpretation most favorable to the insured, since the vagueness is attributable to the insurance enterprise which should have expressed itself more clearly."

3 Castán, *Derecho Civil Español, Común y Foral* 332–34 (8th ed. 1954, Instituto Editorial Reus) ; see, also, II-I Puig Brutau, *Fundamentos de Derecho Civil* 303–04 (Editorial

Bosch, 1954); Judgment of the Supreme Court of Spain of December 13, 1934 (216 *Jur. Civ.* 317) (Editorial Reus, S. A., 1935); *Maryland Casualty Company* v. *San Juan Racing Association, ante,* p. 538, 544.

Having examined the contract clauses bearing on the finishing of surfaces and the interpretative letter of September 15, 1950, it is unquestionable that the latter requires a different, more elaborate and costly finishing, and applying strictly the rule of construction of § 1240 to a typical adhesion contract, that letter may be considered as a novation, a requirement additional to the specifications pursuant to § 1485 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 4126, thereby producing the change in the plan—including in the term "plan" the term "specifications"—24-2 Scaevola, *Código Civil* 132 (2d ed. 1951, Instituto Editorial Reus), which entails the right to demand an increase in the price.

■■ We can not agree, however, with the method employed by the trial court in computing the *increase in price* by reason of increase in work, as authorized by § 1485 of our Civil Code. After holding correctly, as a conclusion of law, that the defendant was bound to pay to the plaintiff "the additional cost incurred in the finishings," it seems that it decided to estimate the reasonable value instead of the increase in price or the additional cost. At first blush, it seems to be the same thing, but it is not.

The reasonable value (*quantum meruit*) is taken in the case of an implied obligation arising from an invalid contract merely because of some irregularity in form or execution thereof. 43 Am. Jur. 833, § 89. The increase in price is the price resulting from an order or from an additional requirement which in turn results in an increase in wages or materials. In the former, the price is an expertise price provided it is a work contract for an uncertain price: Judgment of the Supreme Court of Spain of November 22, 1869—20 *Jur. Civ.* 570 (edited by *Imprenta de la Revista de Legislación,* 1869),

commented by Cámara in his treatise *Agrimensura y Arqui-tectura Legal*, p. 537 (4th ed. by Carlos Bailly—Bailliere, 1871) ; in the latter, the price is the price reconciled in a work contract for a price certain.

■ The basis taken by the trial court was the reasonable value of the finishing of 312,800 square yards of concrete surface, excluding floors and tiles, and including the reasonable profit to the contractor, amounting to $240,300. It then deducted therefrom the sum of $186,400 determined by contractor Zequeira in his own estimate in connection with the original contract, arriving at the conclusion that the additional cost of the finishings would be the difference between both sums, adding also 1.5 per cent of the additional payroll for social security and 3.2 per cent of the additional payroll for workmen's compensation, computing the latter at one half of the difference, since only one half of the *increase in price* corresponded to labor: $53,900, $404.25, and $862, totalling $55,166.25.

Regarding the expertise value, there is a serious objection: the expert's own testimony to the effect that he had not taken into account the construction plans shows that he did not deduct the surfaces of the "open spaces", and estimated that all the structures were "solid," treating them as a continuous monolithic body. Regarding the contractor's estimate in connection with the original contract, there is another serious objection: the evidence shows that those estimates were arbitrary breakdowns for the partial payments authorized in the contract—see item 31(b) of the Specifications and General Conditions of the contract, p. 50—"and should not be taken as fixing the basis for increases or deductions of the contract price." Hence, it is a symbolical value within the mechanics of the partial payment.

The bases for computing the *increase in price* would have to be different. First, the determination of the cost of labor and of the materials for the finishing involved in the contro-

versy, pursuant to the terms of the original contract of September 12, 1950. Second, how much was the cost of labor and of the materials for the finishings involved in the controversy, pursuant to the terms of the interpretative letter of September 15, 1950. Since we are no longer concerned with the reasonable value but with an *increase in price*, the only basis ·for adding to that cost of labor and materials, the social-security policies, and the workmen's compensation would be the increase in working personnel and the extension in the additional time required for completion of the contract.

In this petition before this Court, the contractor alleges that the cost of labor incurred in the finishings of surfaces may be deducted from certain items which are marked in red pencil on his payrolls, which items represent the corresponding breakdown. There is also a breakdown in the listings of materials sufficient to determine the cost of the materials used in such finishings. The appellee alleges, on the contrary, that the exact dates and the percentage of work done on those finishings may be determined on the basis of its daily reports; that there is some evidence that materials which were included as cost of the finishings correspond to other works. By employing the "reasonable value" method instead of the "increase in price," the trial court made no conclusion on such important aspects of the evidence.

We have examined the impressive volume of data contained in the evidence, and we sincerely believe that in order to reconcile the figures shown on the payrolls and the lists of materials with the Authority's daily reports, which show more or less the type of work done and the dates on which the work was performed, the trial court will need a court expert who, together with the experts of the parties, or by himself, may proceed to do that work, for on such analysis depends the determination, with the greatest degree of accuracy, of the cost of the finishings in accordance with the interpretative letter, in order to compare it with the cost of

those finishings in accordance with the terms of the contract. This would be more advisable than to rely on the breakdowns of those items submitted by the parties. Perhaps the trial court would prefer to hold additional hearings for the purpose of clarifying some dubious points. The best course would be to leave to the sound discretion of the trial court, within the ample power which a court actually has to conduct its proceedings, whatever it deems most advisable in order to reach a final determination of the *increase in price*. Rule 71 of the Rules of Civil Procedure.

The judgment will be reversed in accordance with the terms of this opinion as to everything concerning the manner in which the increase in price was determined.

Mr. Justice Blanco Lugo agrees in the result.