Michon M. THRALL, formerly known as Michon M. Alvey, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–1623V.

United States Claims Court.

Oct. 15, 1992.

John M. Burke, Coon Rapids, Minn., for petitioner.

Eleanor A. Barry, with whom were Asst. Atty. Gen. Stuart M. Gerson, Helene M. Goldberg, Director, John Lodge Euler, Deputy Director, and Charles R. Gross, Asst. Director, Washington, D.C., for respondent.

OPINION

ANDEWELT, Judge.

## I.

In this action, petitioner, Michon M. Thrall, seeks compensation under the National Childhood Vaccine Compensation Act of 1986, as amended, 42 U.S.C. §§ 300aa–10 to –34 (the Vaccine Act). Petitioner alleges that she suffered injuries compensable under the Vaccine Act as a result of a DPT (diphtheria, pertussis, and tetanus) vaccination allegedly administered on August 16, 1961. In a May 28, 1992, decision, the special master concluded that petitioner did not satisfy the prerequisites for compensation under the Vaccine Act and dismissed the petition.

The crucial finding underlying the special master's decision is the rejection of petitioner's contention that she received a DPT inoculation on August 16, 1961. The special master found that on August 19, 1961, petitioner manifested the symptoms of encephalitis, an injury listed in the Vaccine Injury Table (42 U.S.C. § 300aa–14(a)(II)(B)) as potentially compensable if the symptoms appear within three days of receiving a DPT vaccination. However, after reviewing all of the evidence, the special master concluded that petitioner failed to demonstrate that she received a DPT inoculation within three days of the first manifestation of encephalitis. The special master concluded: "I *cannot* find it more likely than not that in fact a DPT shot was given to Michon on August 16, 1961, or a[t] any time during the week prior to August 19, 1961." *Thrall v. Secretary, HHS*, No. 90–1623V, slip op. at 5 (Cl.Ct. May 28, 1992) (emphasis in original).

On June 29, 1992, petitioner filed a motion in this court seeking review of the special master's decision. Under the provisions of the Vaccine Act, the Claims Court reviews such special master decisions under a deferential standard. The court may set aside the special master's findings of fact or conclusions of law only if the court determines them "to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 300aa–12(e)(2)(B). Under this standard, this court generally will affirm a decision of a special master if the court finds that the special master considered the relevant evidence of record, drew plausible inferences, and articulated a rational basis for his or her decision. *Hines v. Secretary, HHS*, 940 F.2d 1518, 1527–28 (Fed.Cir.1991). In her petition for review, petitioner asks this court to reverse the special master's conclusion that petitioner failed to demonstrate that she received a DPT inoculation within three days prior to the first manifestation of encephalitis.

## II.

The most relevant evidence in determining whether petitioner received a DPT inoculation on August 16, 1961, the office records of petitioner's pediatrician, has been destroyed and is therefore not available. In the absence of this evidence, petitioner has attempted to prove the August 16, 1961, inoculation date primarily by presenting the testimony of her parents and of Audrey Duell, her parents' neighbor in 1961. Petitioner's parents testified that a DPT inoculation was administered on August 16, 1961, and Audrey Duell testified that she remembered a DPT inoculation was administered sometime during the week of August 14–18, 1961.

The special master considered the testimony of these witnesses but ultimately chose not to rely upon it. To support his rejection of this testimony, the special master focused in part on the long period of time, more than 30 years, that had passed from the date of the alleged inoculation to the date of the witnesses's testimony. The special master concluded: "After hearing their testimony, I found it quite reasonable to credit their testimony as to the frightening events of the morning of August 19, 1961; such events understandably, seem to have been indelibly stamped into their memories. However, I was less than convinced that they possessed actual current, accurate memories of the days *preceding*

August 19, 1961."[1]

The special master also relied upon inconsistencies he perceived between the testimony of petitioner's three witnesses and the factual statements contained in petitioner's medical records. These records, which discuss petitioner's medical condition during the week preceding August 19, 1961, were prepared during two time periods. Some were prepared contemporaneous to the original diagnosis and treatment of encephalitis, beginning on August 19, 1961, and the others were prepared in 1967, when petitioner was hospitalized in an effort to control her seizures.

The special master found it especially significant that although petitioner's parents purported to remember a DPT inoculation on August 16, 1961, not one of these medical records mentions petitioner having received such an inoculation during the week before August 19, 1961. The special master also noted other inconsistencies between the testimony and the records. For example, petitioner's parents testified that they took petitioner to Dr. Dale E. Cumming's office on August 18, 1961, two days after the alleged DPT inoculation, because she had a severe headache and was "staggering." But the medical records suggest that this visit occurred on August 17, 1961, not August 18, and that the underlying symptoms were different—high fever, red throat, and generalized muscle ache. In addition, while petitioner's parents did not remember petitioner suffering from any other malady during this general time period, the medical records suggest that petitioner was suffering from chicken pox ("varicella") during the week prior to August 19, 1961.

As further support for rejecting the testimony of petitioner's parents and Ms. Duell, the special master also relied upon the testimony of Dr. Cumming. Although Dr. Cumming had no specific recollection of the alleged August 16, 1961, DPT inoculation, he did, *inter alia,* answer hypothetical questions about the procedures he general-ly would have followed at that time. The special master focused on three parts of Dr. Cumming's testimony. First, Dr. Cumming testified that if, as petitioner's medical records suggest, petitioner had suffered from chicken pox during the week prior to August 19, 1961, Dr. Cumming probably would not have administered a DPT vaccination on August 16, 1961. Second, Dr. Cumming testified that when he viewed petitioner's convulsions on August 19, 1961, he "would hope" that he would have remembered any administration of a DPT vaccination three days earlier, and if he did remember such a vaccination, he probably would have included a note to that effect in the hospital medical records from that date. (There was no mention of such a DPT inoculation in those records.) Third, the medical records indicated that petitioner was given penicillin during an office visit on August 17 or 18, 1961. Dr. Cumming testified that if a child who had received a DPT vaccination a day or two previously had been presented to him with a fever and generalized muscle ache, he would have suspected a reaction to the vaccination and, as a result, probably would not have given penicillin or other antibiotics to the child.

The special master explained the general rationale underlying his decision as follows:

> In mentioning all these inconsistencies and other points concerning the medical records, I hasten to add that no *one* of them appears to me to be conclusive. Any particular medical record might in fact be erroneous, and any particular mistake in the witnesses' memories might be insignificant. Indeed, even when I view all the evidence as a whole, there is still slight room for doubt. I do not find it wholly *impossible* that Michon received a DPT shot during the week of August 14–18, 1961. But when I weigh all the evidence together, I do *not* find it *more probable than not* that she received such an inoculation during that week.
>
> Again, I note that I do *not* find that petitioner's three witnesses testified dis-

---

1. *Thrall,* slip op. at 6 (emphasis in original) (On August 19, 1991, petitioner was found with her limbs "thrashing about wildly." Her parents rushed her to the hospital where she was diagnosed as suffering from encephalitis-type seizures.).

honestly before me. I do not doubt, for example, that *sometime* during the summer of 1961, the Alvey and Duell families did have the outing described. Nor do I find it unlikely that Michon received an inoculation *sometime* during that summer—perhaps, indeed, during the week following the trip. But I did not find the witnesses' memories to be very accurate as to the *specific timing* of events prior to the fateful morning of August 19. Further, I find it very possible that the witnesses may have subconsciously convinced themselves as to the alleged timing of the DPT shot only in recent years, after reading (as they described before me) a newspaper article and hearing from friends concerning the potential dangers of the DPT immunization.

On the other hand, while I do not find the absence of mention of the DPT shot from *any particular* medical record to be of particularly great weight, the weight of such absence from *every* record is significant. Of further significance is the likelihood that Michon had been thought to have been suffering from chickenpox or from similar symptoms approximately a week prior to August 19, 1961, lessening the likelihood that she would have been given a DPT shot during the following week. Weighing these factors and all the evidence, I must rule against petitioner on this issue.

*Thrall,* slip op. at 9 (emphasis in original).

### III.

■ Petitioner initially contends that the court should reverse the special master's decision on the ground that in evaluating the evidence, the special master ignored the legal requirement that "[c]lose questions of causation must be resolved in favor of [p]etitioner." But, contrary to petitioner's contention, the Vaccine Act contains no such legal requirement. Rather than providing that a petitioner necessarily prevails if he or she can establish a "close question" as to causation, the Vaccine Act

provides that where, as here, a petitioner bases his or her claim to compensation on the Vaccine Injury Table, the burden rests squarely on the petitioner to establish by a preponderance of the evidence that the vaccine was administered within the time schedule set forth in the Table.

The controlling legal standard in this regard is set forth in 42 U.S.C. § 300aa–13(a), which provides that to qualify for compensation, a petitioner must demonstrate "by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1)." Section 300aa–11(c)(1) in turn requires that where, as here, a petitioner contends that he or she suffered an injury that is listed in the Vaccine Injury Table, the petition must demonstrate either (1) that the vaccine caused the injury or (2) that "the first symptom or manifestation of the onset or significant aggravation of" the injury occurred within the time period set forth in the Vaccine Injury Table.[2] Herein, since petitioner relies exclusively on the Vaccine Injury Table and presents no evidence that the vaccine was the direct cause of the injury, 42 U.S.C. §§ 300aa–11(c)(1) and –13(a)(1) require petitioner to demonstrate by a preponderance of the evidence that the inoculation occurred within the time period set forth in the Vaccine Injury Table. It is not sufficient for petitioner to present only enough evidence to show a "close question" as to the date of the inoculation.

### IV.

■ Next, petitioner faults the special master for allegedly using different standards in evaluating the different types of evidence. Petitioner contends that the special master required "clear and convincing" evidence from petitioner's three witnesses who testified that the DPT inoculation was administered during the week of August 14, 1961, but in evaluating the medical records and other evidence indicating to the contrary the special master used a much

**2.** Pursuant to 42 U.S.C. § 300aa–13(a)(1), respondent may overcome petitioner's evidence in support of the petition by showing that there is "a preponderance of the evidence that the ill-ness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition."

more lenient standard. However, when making his determination as to the date of the inoculation, the special master specifically purported to apply a preponderance of the evidence standard ("I *cannot* find it more likely than not that . . ."). Therefore, petitioner's argument, at its essence, is not with the legal standard the special master purported to employ, but rather with the actual weight the special master gave to the various types of evidence, including the special master's assessment of the credibility of petitioner's three witnesses.

But "[d]etermining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). Under the controlling provisions of the Vaccine Act, the Claims Court may interfere with a special master's assessment of weight and credibility only where the court determines that the special master's treatment of the evidence resulted in findings of fact or conclusions of law that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 300aa–12(e)(2)(B); *Hines*, 940 F.2d at 1527. Here, the special master was faced with the difficult task of weighing arguably conflicting evidence. Upon review of the entire record, the court simply cannot conclude that the special master's failure to adopt testimony of petitioner's three main witnesses as to the timing of the DPT inoculation was arbitrary, capricious, or an abuse of discretion.

## V.

■ Next, petitioner faults the special master for giving any weight at all to the medical records prepared in 1967, which, *inter alia*, describe petitioner's health from six years earlier during the week prior to August 19, 1961. Petitioner contends that the special master should not have considered these records because they constitute hearsay, the source of the information contained in the records is not clear, and the records are inherently unreliable, *inter alia*, because they are inconsistent with each other and with other evidence.

The court concludes that it was not reversible error for the special master to consider these records. Even if the court agreed that the 1967 records were hearsay, this would not mean that the special master committed reversible error in considering them. Rule 8(b) of Appendix J of the Rules of the United States Claims Court gives a special master reasonable discretion when determining what evidence to consider. Rule 8(b) provides: "In receiving evidence, the special master will not be bound by common law or statutory rules of evidence. The special master will consider all relevant, reliable evidence, governed by fundamental fairness to both parties."

The 1967 medical records not only are relevant to the issue of whether a DPT vaccine was administered on August 16, 1961, but also are relevant in assessing the credibility of the three witnesses upon whom petitioner primarily relies. As to reliability, the records were prepared by a medical doctor contemporaneous with a patient receiving medical care and, consequently, some degree of care in preparation should be presumed. It is true that these records are inconsistent in some respects and apparently are not completely accurate. But with respect to the parts of the records upon which the special master relied, *i.e.*, the absence of any mention of a DPT inoculation administered on August 16, 1961, and the notation of chicken pox symptoms during the week of August 14–18, 1961, the 1967 records not only are consistent with each other but also are fully consistent with, and indeed repetitive of, certain statements contained in the 1961 records.

Moreover, Dr. Cumming's testimony supports the special master's conclusion that inconsistencies in the 1967 records likely are the result of poor recollections by petitioner's parents in 1967 of the pertinent events in 1961. Dr. Cumming testified that there was only "a remote possibility" that the pertinent statements in these records were supplied by the referring physician and that "in most instances, [the medical records] reflect[ ] [the drafter's] under-

standing of what the parents had to say." Dr. Cumming also agreed that "if this history is inaccurate or confused, it is because the parents were more likely than not inaccurate or confused back in 1967." Apparently relying in part on this testimony, the special master reasoned:

> This history is probably also somewhat garbled in several other respects.... The accuracy of each detail, however, is of little relevance; the important point is that a *week's* prior history is described, most probably upon the report of one of Michon's parents, *without* mention of a DPT inoculation. Indeed, the fact this history is somewhat garbled cuts *against* petitioner's claim here; *i.e.*, it indicates that even by 1967, Michon's parents' memories as to details surrounding the August 1961 incident were already, understandably, subject to considerable error, and were very *different* from the memories that they *now* report.

*Thrall,* slip op. at 8 n. 11 (emphasis in original).

The special master acknowledged that there were problems with the 1967 records. But the special master considered their contents, drew plausible inferences, and articulated a rational basis for his treatment of those records. His decision to give some weight to these records cannot reasonably be classified as "unfair." The events in issue occurred over 30 years ago and when assessing the credibility of any witnesses's recollections from 30 years ago, it would appear "fair" to all parties to consider the contents of medical records created far closer to the time of the alleged incident.[3]

## VI.

Finally, petitioner faults the special master essentially for relying upon some portions of Dr. Cumming's testimony while rejecting other parts. For example, petitioner faults the special master for not adopting Dr. Cumming's testimony at a second hearing before the special master that petitioner did not have chicken pox when she entered the hospital on August 19, 1961, and that petitioner had been brought in for an office visit on August 18, 1961, as petitioner's parents had testified, rather than on August 17, 1961, as reflected in the medical records. But, as explained above, weighing evidence and assessing credibility is within the province of the trier of fact and there is nothing inherently suspect when a trier of fact relies upon only a portion of a particular witness's testimony. Here, in each instance where the special master did not adopt a position proffered by Dr. Cumming, additional evidence in the record supported the special master's finding.[4]

In sum, the special master appears to have reviewed the record carefully and made a diligent effort to weigh the various types of evidence fairly and correctly. The testimony of petitioner's three witnesses certainly supports a conclusion that a DPT inoculation was administered within the three-day statutory period 30 years ago. On the other hand, a contrary conclusion is supported by deficiencies in these witnesses's testimony, the amount of time that has passed since the alleged inoculation, the

---

3. Petitioner contends that the special master committed error by failing to question the parents as to the source of the information contained in the 1967 medical records. Given the benefit of hindsight, it arguably would have been preferable had someone questioned petitioner's parents on the issue of whether they were the source of this information. But petitioner's counsel had the opportunity to ask such questions. Moreover, the source of the information in the medical records reasonably came either from petitioner's parents, petitioner's doctors, or other medical records. Each of these sources at that time would tend to be credible and whichever the source, the medical records would tend to conflict with the current testimony of petitioner's three witnesses.

4. Indeed, Dr. Cumming's testimony at the second hearing as to chicken pox not only is inconsistent with the 1961 and 1967 medical records, but also is at odds with Dr. Cumming's testimony at the first hearing before the special master that "perhaps it's possible" that petitioner did have chicken pox seven to ten days prior to admission into the hospital on August 19, 1961. In any event, the special master held that petitioner was suffering from chicken pox "or from similar symptoms" and at the second meeting Dr. Cumming acknowledged the presence of a rash on August 19, 1961.

medical records prepared in 1961 and 1967, and the above-referenced testimony of Dr. Cumming. The issue before the court is not whether this court would have made the same findings as the special master, but rather whether the findings and conclusions of the special master were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 300aa–12(e)(2)(B); *Hines*, 940 F.2d at 1527. Upon review of the entire record, the court concludes that the special master's decision is consistent with the requirements of the Vaccine Act and therefore must be sustained.

### *Conclusion*

For the reasons set forth above, the special master's May 28, 1992, decision is sustained and the Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.