**Jean Ann Springer STAPLES, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 90–1205V.**

United States Court of Federal Claims.

Jan. 26, 1994.

John R. Brydon, Long Beach, CA, attorney of record for petitioner.

Vincent J. Matanoski, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for respondent.

## OPINION

YOCK, Judge.

This case is before the Court on the petitioner's motion for review of Chief Special Master Gary J. Golkiewicz's August 16, 1993, order dismissing the petitioner's claim under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 through 300aa–34 (1988 & Supp. III 1991) (the "Vaccine Act" or the "Act").[1] For the reasons set forth below,

1. Currently, the Court has five other factually    and legally identical cases pending. Chief Spe-

the Court denies the petitioner's motion for review and affirms the Special Master's order and dismissal.

### Facts

For purposes of this review, the following facts are not in dispute: On April 18, 1955, the petitioner purchased several vials of inactivated polio vaccine ("IPV")[2] from her local pharmacy in Houston, Texas. That same day, the petitioner took the vials she had purchased to her physician, Dr. Greer, who administered the initial dose of the vaccine to the plaintiff's two children. Two days later, the petitioner's children began to experience temperatures, loss of appetite, listlessness, diarrhea and nausea. These symptoms continued for five days. On April 28, 1955, the petitioner learned from a radio report that the Cutter inactivated polio vaccines were being recalled because they had not been fully inactivated. In essence, the contaminated Cutter vaccine contained the infectious polio virus. After hearing the radio report, the petitioner checked the remaining vials in her refrigerator and determined that she had indeed purchased the Cutter vaccine. After making this discovery, she immediately returned the remaining vials to her pharmacy as instructed by the U.S. Public Health Department. Between May 4 and May 7, both the petitioner and her husband began to experience diarrhea, vomiting, elevated temperatures and an inability to get out of bed without assistance. In addition to the symptoms experienced by her husband, the petitioner also experienced severe headaches and severe neck and shoulder pain. On May 9, the petitioner's physician examined her and concluded that she had contracted paralytic polio. After the diagnosis of polio was confirmed, the petitioner was admitted to the Hedgecroft Hospital, a polio treatment center. The next day, the petitioner suffered respiratory failure and was placed in an iron lung. On May 11, the petitioner required an emergency tracheotomy and lapsed into a four-month coma. The petitioner was discharged from the Hedgecroft Hospital in May of the following year.

According to the respondent's expert, Dr. Lee, Ms. Staples currently suffers from post polio syndrome. Her symptoms currently include diminished respiratory capacity, increased fatigue, difficulty sleeping, arthralgia of the knees and ankles and severe scoliosis. In addition, Ms. Staples is required to spend between 14 and 16 hours each day in her iron lung. The petitioner contends that she contracted polio from contact with her children who had been exposed to the Cutter IPV vaccine, and that as such she is eligible for compensation under the National Vaccine Injury Compensation Program.

### Discussion

■ The single issue presented for review is whether the Vaccine Act limits compensation for community acquired polio to those

cial Master Golkiewicz treated the case at bar as the lead case, and dismissed the other five cases pursuant to his orders of August 18, 1993. The other five cases are: *Beard v. Secretary of the Dept. of Health and Human Services*, No. 91–157V (Fed.Cl.Sp.Mstr. August 18, 1993); *Welsh v. Secretary of the Dept. of Health and Human Services*, No. 91–759V (Fed.Cl.Sp.Mstr. August 18, 1993); *Connone v. Secretary of the Dept. of Health and Human Services*, No. 90–1709V (Fed. Cl.Sp.Mstr. August 18, 1993); *McNutt v. Secretary of the Dept. of Health and Human Services*, No. 91–608V (Fed.Cl.Sp.Mstr. August 18, 1993); and *Hanson v. Secretary of the Dept. of Health and Human Services*, No. 90–3422V (Fed.Cl.Sp. Mstr. August 18, 1993). Individual sections of the Act will be cited by section number, without reference to 42 U.S.C. § 300aa.

**2.** The Salk vaccine (IPV) is made of noninfectious or "inactivated" virus particles that are then injected into the patient. The Salk vaccine (or "IPV") is manufactured in a process that entails destroying the virus' infectivity, while retaining its ability to immunize the patient against polio. Stanley A. Plotkin, M.D. & Edward A. Mortimer, Jr., M.D., *Vaccines*, p. 161–62 (1988). When the IPV was first released in 1955, there were only six manufacturers that produced the IPV, one of which was Cutter Pharmaceutical. After wide-scale polio vaccinations began in 1955, a number of people developed paralytic poliomyelitis as a result of a substandard or contaminated batch of IPV produced by Cutter. In all, 126 persons contracted the polio virus from family members who had been injected with the Cutter vaccine, and 40 persons contracted the virus from nonfamily contacts who had received the Cutter IPV injection. N. Nathanson & A.D. Langmuir, *The Cutter Incident: Poliomyelitis Following Formaldehyde–Inactivated Poliovirus Vaccination in the United States During the Spring of 1955*, 78 Am.J.Hyg. 16, 16 (1963).

who contract polio from recipients of an oral polio vaccine ("OPV"),[3] or whether polio contracted from recipients of contaminated IPV is also compensable under the Act, as the petitioner contends. In order to fully appreciate the nature of the apparent statutory conflict in this case, it is necessary to first understand the interaction of the various statutory provisions at issue. As the Chief Special Master correctly observed in his decision, the relevant statutory framework begins with 42 U.S.C. § 300aa–13(a), which sets forth the standard to be used in determining eligibility under the Act. Section 13(a) provides in pertinent part:

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

42 U.S.C. § 300aa–13(a)(1) (1988 & Supp. III 1991). In short, section 13(a)(1)(A) requires the petitioner to prove each element of her petition with a preponderance of the evidence. Although section 13(a) does not itself set forth the requirements of a petition under the Act, it makes reference to section 11(c), which sets forth the specific elements of a valid petition under the Act. Section 11(c), entitled "Petition content," indicates that a claimant under the Act must establish by affidavit or other supporting evidence that the injured party was harmed by a vaccine specified in the Vaccine Injury Table, "or, if such a person did not receive such a vaccine, contracted polio, directly or indirectly, from another person who received *an oral polio*

*vaccine* * * *." 42 U.S.C. § 300aa–11(c)(1)(A) (1988 & Supp. III 1991) (emphasis added). Moreover, section 11(c)(1)(B)(ii) requires a petitioner to demonstrate that:

(ii) if such person did not receive such a vaccine [set forth in the Vaccine Injury Table] but contracted polio from another person who received *an oral polio vaccine,* was a citizen of the United States or a dependent of such citizen * * *.

42 U.S.C. § 300aa–11(c)(1)(B)(ii) (1988 and Supp. III 1991) (emphasis added). When section 11(c) is read together with section 13(a), it is clear that a petition must allege that *either* (1) the petitioner received a vaccine listed in the Vaccine Injury Table; or (2) the petitioner contracted polio from a recipient of "an oral polio vaccine." Additionally, section 13(a) requires the plaintiff to establish either of these two elements with a preponderance of the evidence.

An apparent conflict surfaces, however, when one turns to the Vaccine Injury Table itself, 42 U.S.C. § 300aa–14(a) (1988 & Supp. III 1991). Of course, as noted above, the Vaccine Injury Table is incorporated by reference into sections 11(c) and 13(a). Although there is no dispute that the Table covers injuries caused by the oral polio vaccine, it never specifically uses the term "oral vaccine." Instead of referring to OPV by name, as section 11(c) does, the Table refers more generally to "Polio Vaccines (other than inactivated Polio Vaccine)." Section 14(a)(III) of the Table provides for injuries caused by:

Polio Vaccines (other than Inactivated Polio Vaccine).

A. Paralytic polio

* * * * * *

—in a vaccine-associated community case

The section following the provision set out above (Section 14(a)(IV)) provides compensation for anaphylaxis or anaphylactic shock

---

**3.** The OPV, also known as the Sabin vaccine, is made of live infectious virus particles that have been attenuated in neurovirulence. The OPV is administered orally, whereas the inactivated polio virus is administered by means of an injection. Since 1962, the Sabin OPV has evolved to

become the primary means of protecting individuals in the United States from paralytic polio. J. Salk & J. Drucker, "Known Infectious Polio Virus Vaccine," *Reprinted in* Stanley A. Plotkin, M.D. & Edward A. Mortimer, Jr., M.D., *Vaccines,* p. 158 (1988).

caused by IPV, or any acute complication or sequela (including death) of an illness, disability, or injury caused by an IPV, but not for community contact cases resulting from an injection of IPV.

1. *The Plaintiff's Argument*

In her petition, the petitioner alleges a vaccine associated community case. There is no question that she did not receive the IPV herself, but rather she contracted paralytic polio from her children who had been injected with the Cutter IPV. The basis of the petitioner's argument is that the Vaccine Act provides compensation to those injured by vaccines listed on the Vaccine Injury Table, and that the Table provides for compensation for community contact paralytic polio cases when the person from whom the petitioner contracted polio received "Polio Vaccines (other than Inactivated Polio Vaccine)." The petitioner argues that the term "Polio Vaccines (other than Inactivated Polio Vaccine)" is not restricted to OPV, and that the term necessarily *includes* contaminated or defective IPV. In essence, the petitioner asserts that the vaccine her children received was not inactivated—it was *"other* than inactivated." Indeed, there is no question that if the vaccine her children received had been "inactivated" (as it should have been) the tragic events serving as the basis for her petition would not have occurred. The petitioner's argument is that Congress could have easily and definitively restricted compensation for community contact cases to those who had come into contact with recipients of OPV if it had intended to do so. The petitioner contends that:

Congress nonetheless, defined polio vaccines in the table based on whether they were "inactivated" or "other than inactivated." Not [sic] on whether the vaccine was, or was not, an oral polio vaccine. In fact "oral polio vaccine" is *not* a vaccine listed on the vaccine injury table.

Chief Special Master Golkiewicz's Opinion at 6 (August 16, 1993) (citing Petitioner's Brief at 10). The petitioner argues that by failing to specifically limit compensation to OPV injuries, Congress implicitly authorized compensation in defective IPV community contact cases.

The petitioner further argues that medically, there are only two types of polio vaccine—OPV and IPV. The petitioner contends that because the Table provides compensation for those injured by "Polio *Vaccines* (other than Inactivated Polio Vaccine)," it is axiomatic that the plural usage of the word "vaccine" includes *both* OPV and contaminated IPV. In essence, the petitioner argues that if Congress excluded one of the two types of vaccine by the use of the words "other than inactivated," there would be no need for the use of the plural "Polio Vaccines," unless her reading is the correct one.

In further support of her argument, the petitioner contends that the clear conflict between section 11(c) and the Vaccine Injury Table justifies resort to the legislative history of the Vaccine Act. Moreover, according to the petitioner, the Court should give greater weight to the Table (which arguably allows compensation for injuries caused by a defective IPV) than to section 11(c) (which specifically requires allegations of injury by an OPV) because of the broad legislative goal of compensating those injured by vaccines. The petitioner contends that a broader interpretation is consistent with the policy underpinnings of the Vaccine Act to provide an alternative to traditional tort litigation quickly, easily, with certainty and generosity. The petitioner argues that:

"For some time the courts have been committed to give statutes which are enacted for the protection and preservation of public health an extremely liberal construction in order to accomplish and maximize their beneficial objectives." * * * These statutes are given liberal construction and any "exceptions from clearly articulated public policy obligations should be construed narrowly. Weight is given to the practical effects of a possible construction and an unreasonable result is avoided." [citations omitted]. Such construction should be given to the Act here.

*Petitioner's Motion for Review,* at 11 (Sept. 15, 1993). In her brief, the petitioner argues that the Chief Special Master's conclusion that the Act does not compensate for IPV-

related community contact injuries unduly restricts the purpose of the Act.

What the Chief Special master has done is to completely ignore the plain language of the Vaccine Injury Table and redefine "other than inactivated" to mean oral polio vaccine. This is a strict and narrow view of the the the [sic] Act, which was designed to ensure that all victims of vaccines are compensated, and excludes a very small class of recognized injured persons. Such construction is be [sic] inconsistent with the obvious intent of the Table, which is to extend compensation and [sic] all paralytic polio victims in vaccine-associated community contact cases involving other than inactivated polio vaccines.

*Id.* According to the petitioner, "the Chief Special Master's [decision] is clearly at odds with the general purpose of the Act, and is an unjustified rewriting of the Vaccine Injury Table." *Id.* at 12.

### 2. *The Respondent's Argument*

The respondent counters by asserting that the Vaccine Act limits compensation to those petitioners who demonstrate that they developed polio from contact with someone who received an *oral* polio vaccine. The respondent argues that the Chief Special Master's decision was proper because the petitioner was unable to either allege or prove that she contracted polio from a recipient of an OPV as required by sections 11(c) and 13(a). The respondent asserts that the Court would have to ignore the clear and unambiguous requirements of sections 11(c) and 13(a) to uphold the petitioner's reading of the Vaccine Injury Table, and that such a result would essentially eviscerate Congress' intent in creating the Injury Table. The respondent further argues that section 11(c) and the Vaccine Injury Table are not in "irreconcilable conflict" with each other, as the Chief Special Master contended, and that both provisions require contact with a recipient of an OPV in a community contact case. The respondent explains that the phrase "Polio Vaccines (other than Inactivated Polio Vaccine)" in the Injury Table only includes OPV—not defective IPV, as the petitioner contends. Moreover, according to the respondent, "[t]his phrase simply indicates that section III does

not cover 'Inactivated Polio Vaccine,' a vaccine that is specifically addressed by section IV of the Table." *Respondent's Memorandum in Response to Petitioner's Motion for Review*, at 12 (Oct. 15, 1993). The respondent contends that section IV of the Table makes specific reference to injuries caused by "Inactivated Polio Vaccine," and that IPV-related community contact cases are not among those for which Congress authorized compensation.

In section IV of the Vaccine Injury Table, when setting forth the compensable IPV injuries, Congress did not refer to injuries caused by *"defective"* IPV or *"contaminated"* IPV—it merely referred to injuries caused by IPV. Why then, the respondent asks, should a *different* meaning be assigned the same term as it is used in the preceding section of the table. According to the respondent's logic, if the caption of section IV (which undoubtedly refers to injuries caused by IPV) is changed to read: *"Defective* IPV" (as it no doubt could without changing the meaning of that section), it is difficult to understand why the term "other than IPV" (as used in section III) would not mean "other than *Defective* IPV." The respondent argues that since the term IPV is used consistently throughout the Table, the petitioner's argument finds no support. In further support of its argument, the respondent argues that there are multiple types of oral polio vaccines—which accounts for the plural use of the word "vaccines" in the phrase "Polio Vaccines (other than Inactivated Polio Vaccine)."

In response to the petitioner's discussion pertaining to the Act's legislative history, the respondent contends that the legislative history demonstrates that Congress not only intended to place limitations on those who may receive compensation, but that it in fact did so by requiring contact with an OPV recipient in community contact cases. According to the respondent, Congress has limited the scope of the Act by placing considerable limits on the coverage of the Vaccine Act. For instance, petitioners who cannot demonstrate sufficient unreimbursed expenses are not eligible for compensation. Also, geographical limits are imposed. In

addition, petitioners have a limited time in which to file suit. Further, prior legal actions also circumscribe eligibility for compensation under the Act. Therefore, according to the respondent, it is clear that Congress' intent was not to compensate *all* individuals harmed by vaccines regardless of the circumstances.

As stated by the respondent in its brief, "[s]uch appeals to broad policy prerogatives are unavailing when they contradict the plain language of a statute." *Respondent's Memorandum in Response to Petitioner's Motion for Review,* at 7 (Oct. 15, 1993) (citing *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986)). The respondent asserts that the plain language of the statute and the legislative history of the Act make it clear that the Congress was aware of OPV-related community contact cases, but, according to the respondent, the petitioner has failed to demonstrate that Congress ever considered the potential for IPV-related community contact cases or, for that matter, the 1955 Cutter incident when it enacted the 1986 Vaccine Act. Since the petitioner cannot point to clear and unambiguous legislative history to that effect, the respondent urges that the petitioner's claim must fail.

The respondent finally argues that because the Vaccine Act is a waiver of sovereign immunity, any provision for compensation must be clearly and unambiguously expressed. According to the respondent, the petitioner's resort to the vague and inexplicit policy objectives set forth in the Act's legislative history will not suffice to support a waiver of sovereign immunity.[4]

### 3. *Standard of Review*

Prior to the enactment of the 1989 amendments, the Court was authorized to review proposed findings of fact or conclusions of law prepared by the special master and to make a "de novo determination of any matter." 42 U.S.C. § 300aa–12(d)(1) (1988); *see also Davis v. Secretary of D.H.H.S.,* 19 Cl.Ct. 134 (1989); *Bunting v. Secretary of D.H.H.S.,* 19 Cl.Ct. 738 (1990), *rev'd on other grounds,* 931 F.2d 867 (1991). The amendments promulgated in 1989 precluded *de novo* review of all determinations made by the special master, and set forth varying standards of deference with regard to different aspects of the special master's decision. The current standard of review for cases arising under the Vaccine Act is found in 42 U.S.C. § 300aa–12(e)(2). That section provides in pertinent part:

> (2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—
>
> \*      \*      \*      \*      \*      \*
>
> (B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and issue its own findings of fact and conclusions of law \* \* \*.

42 U.S.C. § 300aa–12(e)(2) (1988 & Supp. III 1991). Under this standard, the special master's findings of fact are reviewed under the arbitrary and capricious standard, discretionary rulings are reviewed under the abuse of discretion standard, and legal questions under the "not in accordance with the law" standard. *See, e.g., Neher v. Secretary of*

---

4. According to the petitioner's Motion for Review, "[a]lthough respondent has continually maintained throughout the existence of this program that the Act involves a waiver of sovereign immunity, that issue has apparently not yet been squarely decided by the Federal Circuit Court of Appeal [sic]." *Petitioner's Motion for Review,* at 8 (Sept. 15, 1993). The petitioner's citation to *Jessup v. Secretary of D.H.H.S.,* 26 Cl.Ct. 350 (1992) is unavailing. That case, in fact, held that "[t]he Vaccine Act is one of these types of statutes because it allows costs and attorney's fees to

be recovered against the Government \* \* \*. However, this section cannot be construed broadly, as the special master has done, because 'limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.'" *Id.* at 352. The Court is puzzled by the petitioner's assertion that the Act is not a waiver of sovereign immunity, *especially* in light of *Jessup,* 26 Cl.Ct. at 352, *Edgar v. D.H.H.S.,* 29 Fed.Cl. 339, 345 (1993), and *Patton v. D.H.H.S.,* 28 Fed.Cl. 532, 535 (1993).

*D.H.H.S.,* 984 F.2d 1195, 1198 (Fed.Cir.1993); *Munn v. Secretary of D.H.H.S.,* 970 F.2d 863, 870 n. 10 (Fed.Cir.1992); *Hines v. Secretary of D.H.H.S.,* 940 F.2d 1518, 1524 (Fed. Cir.1991); *Hale v. Secretary of D.H.H.S.,* 22 Cl.Ct. 403, 406 (1991).

In the instant case, the Court must determine whether the Vaccine Act authorizes compensation for persons contracting polio from a recipient of a defectively inactivated polio vaccine. Because this is a legal question, the Court applies the "not in accordance with the law" standard in our review of the Chief Special Master's decision. As such, the Court reviews the provisions of the statute *de novo* to determine whether the Chief Special Master reached the proper conclusion.

### 4. *Analysis*

As with any case involving statutory interpretation, "we state once again the obvious when we note that, in determining the scope of a statute, one is to look first at its language." *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983) (citing *Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983)). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). While legislative history cannot prevail over the plain meaning of a statute, if the meaning is indeed plain, courts have often held that even in the face of *apparently* unambiguous language, reference is made to the legislative history to assure that no term was used other than for its ordinary meaning. *Decosta v. United States,* 987 F.2d 1556, 1558 n. 3 (Fed.Cir. 1993) (citing *Glaxo Operations UK Ltd. v. Quigg,* 894 F.2d 392, 395 (Fed.Cir.1990)) (stating that the court should resort to legislative history to determine whether there is a clearly expressed legislative intention to the contrary to the statutory language).

In this case, the starting point is 42 U.S.C. § 300aa–13(a) (1988 & Supp. III 1991). This statute provides:

**(a) General rule**

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title * * *.

Section 11(c)(1) sets forth the necessary contents of a petition under the Act. That provision provides:

**(c) Petition content**

A petition for compensation under the Program for a vaccine-related injury or death shall contain—

(1) except as provided in paragraph (3), an affidavit, and supporting documentation, demonstrating that the person who suffered such injury or who died—

(A) received a vaccine set forth in the Vaccine Injury Table or, if such person did not receive such a vaccine, contracted polio, directly or indirectly, from another person *who received an oral vaccine,*

(B)(i) if such person received a vaccine set forth in the Vaccine Injury Table—

\*  \*  \*  \*  \*  \*

(ii) if such person did not receive such a vaccine but contracted polio from another person *who received an oral polio vaccine,* was a citizen of the United States or a dependent of such citizen * * *.

The Vaccine Injury Table, referred to in the preceding two statutory provisions provides:

III. Polio Vaccines (other than Inactivated Polio Vaccine)
   A. Paralytic polio
      —in a non-immunodeficient recipient . . . . . . . . . .30 days
      —in an immunodeficient recipient . . . . . . . . . . . . .6 months
      —in a vaccine-associated community case . . . . . .Not applicable
   \* \* \* \*
IV. Inactivated Polio Vaccine
   A. Anaphylaxis or anaphylactic shock . . . . . . . . . . . .24 hours
   B. Any acute complication or sequela (including
      death) of an illness, disability, injury, or condition
      referred to above which illness, disability, injury,
      or condition arose within the time prescribed . .Not applicable

The petitioner argues that if Congress had intended to limit compensation in vaccine-associated community cases to OPV, it would have labelled section III of the Vaccine Injury Table quoted above, "OPV"—*not* "Polio Vaccines (other than Inactivated Polio Vaccine)." The petitioner further argues, and this Court agrees, that the use of the term "Polio Vaccines (other than Inactivated Polio Vaccines)" for the first and only time in the Vaccine Injury Table creates an ambiguity, which justifies resort to the legislative history to determine what Congress meant by the use of this term. Because section 11(c) must be read in conjunction with the Vaccine Injury Table, *Hellebrand v. D.H.H.S.*, 999 F.2d 1565, 1571 (Fed.Cir.1993); *Thrall v. D.H.H.S.*, 26 Cl.Ct. 1419 (1992); *McClendon v. D.H.H.S.*, 23 Cl.Ct. 191, 195 n. 5 (1991), an apparent conflict exists between the clear and unambiguous terms of section 11(c), and the not-so-clear terms of the Vaccine Injury Table.[5] It is a well-settled rule of statutory construction that a court should attempt to read two apparently contradictory provisions in harmony with one another, and although the respondent's reading of the Vaccine Injury Table would reconcile the apparent conflict, it is nonetheless appropriate for this Court to look to the legislative history when a term or phrase is capable of more than one interpretation. *See Decosta*, 987 F.2d at 1558 n. 3.

■ As a preliminary matter, the Court agrees with the petitioner that the purpose of the Vaccine Act is to compensate victims of vaccine injuries quickly, fairly and generously. As this Court noted in *McClendon v. D.H.H.S.*, 23 Cl.Ct. 191, 194 (1991), Congress intended to create a quick, flexible and streamlined system. The original legislation called for a compensation procedure that administered awards "quickly, easily, and with certainty and generosity." *Id.* at 194 n. 6. The system was intended to be a fair, simple and easy to administer and "to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury." *Id.* However, broad statements of public policy alone cannot serve as a waiver of sovereign immunity. Although it may be *generally* true that "statutes designed to promote the public health and welfare are to be liberally construed," *Petitioner's Motion for Review*, at 11 (Sept. 15, 1993) (citing *United States v. Lee*, 131 F.2d 464, 466 (7th Cir.1942)), the Court will not adopt such an interpretation that would render several clear and unambiguous portions of the statute meaningless. Sections 11(c) and 13(a) could not be any more clear. They require the petitioner to

---

5. While the petitioner argues that the Vaccine Injury Table carries greater weight in the event of a conflict with sections 11(c) and 13(a), the respondent argues that the specific terms of sections 11(c) and 13(a) should govern. As will be discussed below, it is not necessary for this Court to rule on the relative weights to be given these various statutory provisions in the event of a conflict. Although Chief Special Master Golkiewicz held on page 8 of his decision that "the language pertaining to the community contact polio cases, contained in section 11(c) and the Injury Table, is irreconcilably in conflict," the apparent conflict is in fact reconcilable after an analysis of the pertinent legislative history.

demonstrate that she was injured by contact with a recipient of an OPV. This Court cannot accept petitioner's argument that it should simply ignore the clear requirements of the Vaccine Act because of the broad public policy edicts found in the Act's legislative history. The very legislative history upon which the petitioner relies indicates:

> [T]he Committee has chosen to provide compensation to all persons whose injuries meet the *requirements of the petition and the Table* and whose injuries cannot be demonstrated to be caused by other factors.

H.R.Rep. No. 99–660, 99th Cong., 2d Sess. 1, 18, *reprinted in* 1986 U.S.C.C.A.N. 6334, 6359 (emphasis added). It could not be any more clear that Congress intended this Court to read the Table and the petition requirements together.

The legislative history of the Vaccine Act makes it abundantly clear that Congress never even considered claimants who might be injured by a defective IPV in a community contact case. While the history frequently mentions the potential for OPV community contact cases, there is not a single word of discussion of IPV-related community contact cases throughout the entire legislative history.

Early in 1980, the House Interstate and Foreign Commerce Committee asked the Office of Technology Assessment ("OTA") to delineate the specific elements and principles necessary for inclusion in a federal vaccine compensation program. In its report, the OTA indicated that:

> Live oral polio vaccine carries a very slight risk of resultant polio disease (1 in 4,000,-000). *It is actually more common for polio to occur in adults who have close contact with young children who have been vaccinated with live oral polio vaccine.* Typically, these adults were never vaccinated against polio or received less than the full series of live oral polio vaccine in the days when the three types were administered separately.

Office of Technology Assessment, *Compensation for Vaccine–Related Injuries,* p. 25 (Nov.1980) (emphasis added). This first report to Congress clearly anticipated the risk of OPV-related community contact cases. It did not, however, discuss in any manner IPV-related community contact cases. The earliest legislative history of the National Childhood Vaccine Injury Compensation Act also supports the view that Congress did not intend to authorize compensation for community contact IPV injuries. In describing the covered injuries, the Congress indicated:

#### What vaccines are covered

> Diphtheria, Tetanus, Pertussis, Measles, Mumps, Rubella and Polio. These are childhood vaccines mandated by most State laws as a prerequisite for entry into school. (*Persons who contract polio directly or indirectly from persons who received oral polio vaccine are also eligible even though they didn't receive direct vaccination.*)

129 Cong.Rec. 33,803 (Nov. 17, 1983) (emphasis added). Again, Congress did not mention IPV-related community contact cases. A 1986 House Report on childhood immunizations notes that "*the oral polio vaccine* (OPV) carries a very small risk that the recipient or his close nonimmune contacts will develop paralytic polio * * *. No serious side effects of currently available *IPV* have been documented." House Comm. on Energy and Commerce, 99th Cong., 2d Sess., Childhood Immunizations, 31 (Committee Print 99–LL, 1986). Certainly, if Congress had intended to compensate victims in the petitioner's position, it would not have indicated that "[n]o serious side effects of currently available IPV have been documented." *Id.* at 32. In fact, an authoritative treatise on vaccines observed that other than the Cutter Incident, no serious reactions are associated with the IPV. According to Jonas Salk, M.D., and Jacques Drucker, M.D., *Noninfectious Poliovirus Vaccine,* p. 178, *reprinted in* Stanley A. Plotkin, M.D. and Edward A. Mortimer, Jr., M.D., *Vaccines* (1988):

> No paralytic reactions to IPV are known to have occurred since the 1955 cluster of poliomyelitis cases caused by vaccine that contained live polioviruses that had escaped inactivation. *Serious adverse reactions are not anticipated with the current IPV product.*

*Id.* (emphasis added). Another House Report on the same issue advised that:

> In households where any member is immune deficient, no one should receive OPV. Instead, the inactivated polio vaccine (IPV) may be given to both children and adults. IPV is the agent preferred for adult immunization in any case, because the risk of vaccine-associated paralysis following OPV is slightly higher in adults than children.

House Comm. on Energy and Commerce, 99th Cong., 2d Sess., Childhood Immunizations, 31 (Committee Print 99–LL, 1986). This excerpt also recognizes the potential for OPV community contact cases without addressing any such risk for IPV. In fact, the only cautioning remarks about IPV in the legislative history is related to the fact that it "contains trace amounts of streptomycin and neomycin and should not be given to individuals who might have a hypersensitivity reaction to these antibiotics." *Id.* This portion of the legislative history meshes with the Vaccine Injury Table, wherein the only injury presumptively associated with IPV is anaphylaxis—"a hypersensitivity to a foreign substance * * * induced by a small preliminary or sensitizing injection of the substance." Webster's II New Riverside University Dictionary 105 (1984).

Despite Congress' failure to discuss the possibility of IPV-related community contact cases in the legislative history, Chief Special Master Golkiewicz indicated that:

> In fairness, petitioner's argument is not an unreasonable one. Contact polio did in fact occur from at least one IPV—the Cutter produced IPV. In fact, those contact cases would be the first such incident of contact polio since the Cutter IPV predated the OPV vaccine * * *. Thus, it would not have been unreasonable for Congress to provide compensation for IPV contact cases. The court's ruling is that there is not a scintilla of evidence to suggest that Congress did in fact intend to provide such compensation.

*Opinion of Chief Special Master Golkiewicz,* at 14–15 n. 3 (Aug. 16, 1993).

There is no doubt that Congress was aware of the so-called "Cutter Incident" as early as May 25, 1955. In fact, Congress held hearings on the Cutter Incident in which it discussed persons in the petitioner's position. The following excerpt from those hearings makes it abundantly clear that Congress knew of the possibility of IPV-related contact cases, but nonetheless failed to authorize compensation for those few cases when it passed the Vaccine Act in 1986.

> Mr. WILLIAMS. Mr. Chairman, first I would like to ask a question of Dr. Scheele. I am informed that a newscaster on Monday night of this week, I believe, related the story of a 35–year–old father of a child who had been inoculated having contracted polio shortly after his child was inoculated, and dying as a result. The inference that might be drawn from that, and I believe which was intended by this commentator, was to the effect that there was a possibility that even though the child may not have contracted polio as a result of the inoculation, that nevertheless he transmitted it to his father. Doctor, have you progressed far enough in your tests to tell whether that is possible?
>
> Dr. SCHEELE. We think it is possible * * *. There have been some 40 cases of that type that we have entered into our record as having occurred.

*House Hearings on the Poliomyelitis Vaccine and the Poliomyelitis Vaccination Assistance Legislation,* 84th Cong., 1st Sess. 65 (May 25 & 27, 1955) (statement of Dr. Leonard A. Scheele, Surgeon General).

When considering whether Cutter-type incidents might occur in the future, the experts testifying before Congress believed that they would not. In his testimony before the Committee on Interstate Commerce and Foreign Commerce on June 22, 1955, Dr. Albert B. Sabin, the foremost expert on polio vaccines, specifically discussed the potential for future community contact cases caused by inactivated polio vaccine.

> [T]he evidence is now pretty clear that in those instances not only with [sic] the inoculated children themselves endangered but members of their family were also endangered because those children after inoculation were then putting out the virus in their stools and infecting their parents,

some of whom have become paralyzed and died.

The question before us, therefore, is this: What can be done to produce safe vaccine with regularity, and have the new tests Dr. Shannon has just described given us the assurance that another Cutter incident can not occur again in the future?

\*    \*    \*    \*    \*    \*

Therefore, are the new tests sufficiently adequate to prevent such an incident? *I must say that perhaps they are.*

*House Hearings on the Poliomyelitis Vaccine and the Poliomyelitis Vaccination Assistance Legislation,* 84th Cong., 1st Sess., pt. 2, 168–69 (June 22 & 23, 1955) (statement of Dr. Albert B. Sabin, Children's Hospital Research Foundation, Cincinnati, Ohio).

Certainly, having held extensive hearings on the Cutter incident, Congress would have at least mentioned something about IPV-related contact cases or the hearings it held concerning those cases in the later legislative history to the 1986 Vaccine Act if it intended to extend compensation to those individuals. The clear implication of the above-quoted legislative history is that Congress, having full knowledge of the 1955 Cutter Incident, simply did not believe that such an incident would occur in the future, or that past victims injured 30 years ago should be compensated by the 1986 Act.

One final question remains. Query: in the Vaccine Injury Table, why did Congress refer to "Polio *Vaccines* (other than Inactivated Polio Vaccine)," if it was only referring to a singular vaccine—OPV? The reference to

plural vaccines would indeed put section III of the Vaccine Injury Table in irreconcilable conflict with sections 11(c) and 13(a) if there were only one type of OPV. While the Chief Special Master was correct that there are only two *methods* of administering polio vaccines—OPV and IPV, there are *several* types of oral polio vaccine. According to the Food and Drug Administration (FDA) regulations in effect when the Vaccine Act was passed, there are four types of oral polio vaccine—Type 1, Type 2, Type 3 and a trivalent OPV that combines Types 1, 2 and 3. 21 C.F.R. § 630.10(b) (1988).[6] Thus, the FDA regulations provide for several oral polio vaccines: a monovalent vaccine (consisting of only one type of attenuated polio virus strain) for each of the three types of attenuated poliovirus strains, as well as a polyvalent vaccine that combines all of the three known strains.[7] Each type of monovalent oral polio vaccine incorporates only a single strain of attenuated polio virus and only serves to protect the recipient against that particular strain of polio. This is important in interpreting the Vaccine Injury Table because it explains why Congress considered the four available types of OPV separate "vaccines," rather than four variations of a single "vaccine."

As the respondent correctly observed in its brief, courts have discussed the various available types of OPV on many occasions. In *Griffin v. United States,* 500 F.2d 1059, 1062 (3d Cir.1974), the court determined that the plaintiff was injured by Type 3 OPV, rather than Types 1 or 2, which were also distributed during the time period at issue in that case. Again, in *Berkovitz v. United States,* 822 F.2d 1322, 1324 n. 1 (3d Cir.1987), *rev'd*

---

**6.** The current FDA regulations permit *only* a trivalent oral polio vaccine, consisting of a combination of all three types of live attenuated poliovirus. 21 C.F.R. § 630.10(a) (1993). Vaccination by means of multiple doses of a trivalent vaccine comes close to assuring maximum immunity from all three serotypes of the poliomyelitis virus. However, when the Vaccine Act was passed, Congress intended to compensate those who had received a series of all three types of oral polio vaccines as well. According to Congress, "[t]ypically, these adults were never vaccinated against polio or received less than the full series of live oral polio vaccine in the days when the three types were administered separately." Office of Technology Assessment, *Compensation for Vaccine–Related Injuries,* p. 25 (Nov. 1980).

**7.** In fact, according to Stanley A. Plotkin, M.D. & Edward A. Mortimer, Jr., M.D., *Vaccines,* p. 127 (1988):

"Routine use of live oral attenuated poliomyelitis vaccines was begun in many countries during the spring of 1960. [footnote omitted.] In the early years of live vaccine immunization, monovalent vaccines incorporating each serotype separately were the most commonly administered. They were soon replaced by trivalent vaccine, which, in 1965, began to be generally given for routine vaccination of children in the United States."

*on other grounds,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the United States Court of Appeals for the Third Circuit noted that "[t]here are three types of the Sabin strains of polio virus: Types I, II and III. A monopool is a single type. When monopools of the three types are combined, they form a trivalent vaccine." Moreover, in the case of *In re Sabin Oral Polio Vaccine Prods. Liab. Litig.,* 763 F.Supp. 811 (D.Md. 1991), the court discussed in extensive detail the differences between the various types of OPV. The *In re Sabin* case involved the Government's liability for injuries related to an oral polio vaccine because of the FDA's use of safety standards used to develop Type 1 vaccine to test the safety of Type 3 vaccine. The court held that because Type 3 OPV is more neurovirulent than Type 1 OPV, different safety standards should have been used. Moreover, this case demonstrates why Congress considered the various types of OPV different "vaccines," rather than different versions of a single vaccine.

With this explanation in mind, it now becomes clear why section 11 provides for compensation to a person who had contact with a recipient of "*an* oral polio vaccine." The use of the word "an" indicates that Congress intended to provide for injuries caused by *multiple* types of OPV and not merely a single type of OPV—which would have been the case if instead Congress used the phrase "*the* oral polio vaccine" in section 11(c). When read in this light, it becomes clear that section 11(c) and the Vaccine Injury Table can in fact be read in harmony. *See, e.g.,* Sutherland, *Statutory Construction,* § 51.02 (Sands 4th ed. 1984) ("Statutes for the same subject, although in apparent conflict, are construed to be in harmony if reasonably possible."). Section 11(c) requires a petitioner to prove contact with a recipient of an oral polio vaccine in a community contact cases as does Section III of the Vaccine Injury Table. Section IV of the Vaccine Injury Table compensates those sustaining certain injuries attributable to the IPV, but does not allow compensation for the type of injury sustained by the plaintiff here. Although the petitioner might have overcome this result by showing a clear congressional intent to the contrary, she was unable to support her reading of the Injury Table with anything more than broad statements of general public policy.

■ The United States Court of Federal Claims, as is any court of the United States, is a court of limited jurisdiction. It does not have the authority or the jurisdiction to grant recovery against the United States unless it finds a clear and unambiguous waiver of sovereign immunity. Although such a waiver may take the form of either explicit statutory language or ambiguous statutory language combined with explicit legislative history, this Court is unable to find either to support the petitioner's argument in this case. Undeniably, the petitioner and her family have suffered a great tragedy. Unfortunately, an exhaustive search through the legislative history of the National Vaccine Injury Compensation Program of 1986 fails to produce even a scintilla of evidence that Congress intended to compensate persons in her position. While the legislative history is replete with discussions and examples of OPV-related community contact cases, there is no mention whatsoever of either the so-called Cutter Incident or of IPV-related community contact cases in the Vaccine Act's legislative history.

Although this Court is certainly sympathetic with the petitioner's situation, there is simply no way this Court could award her the compensation she seeks without rewriting portions of the Vaccine Act while eviscerating the remainder. This Court is simply not the proper forum to achieve such a result. As the Supreme Court has cautioned on several occasions, "the 'proper theater' * * * 'is the halls of Congress, for that branch of the government has limited the jurisdiction of the Court of Claims.'" *Keene Corp. v. United States,* — U.S. —, —, 113 S.Ct. 2035, 2045, 124 L.Ed.2d 118 (1993) (citing *Smoot's Case,* 15 Wall. 36, 45, 21 L.Ed. 107 (1873)). We enjoy no " 'liberty to add an exception .... to remove apparent hardship,' * * *." *Id.,* and therefore we must enforce the statute as it is written.

## CONCLUSION

For the reasons stated above, the Court finds that petitioner has failed to demon-

strate that the Chief Special Master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Therefore, the Court denies the petitioner's motion for review and sustains the Chief Special Master's August 16, 1993, order dismissing the petitioner's claim. The clerk of the Court is directed to enter judgment accordingly.

No costs on review.